## Aronson v. Gibbs-Inman Co.

May 17, 1940.

Eugene Hubbard, Judge.

Joseph Solinger for appellant.

Stites & Stites and Norris McPherson for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

On January 1, 1935, appellee was engaged in the printing business in Louisville, and on the date mentioned employed appellant to secure advertising contracts for a proposed ''Shopper's Guide;'' contracts for circulars of a corresponding type in the city, and to supervise the editorial features of the Guide.

The contract provided that appellant should receive a fixed percentage of the gross income from the sale of advertising, with a minimum guarantee of $60 per week the first month, $75 the next month, and $100 for the remainder of the contract term. We need not give further details, since there is only in controversy the meaning and application of one clause of the contract, which reads:

''This agreement shall be in force and effect for a period of one year from the 1st of January 1935, unless sooner terminated by mutual consent or by circumstances beyond the control of the parties hereto.''

In his petition filed in January 1936, appellant alleged that he began work immediately upon the execution of the contract, and continued until the 15th of the following month, when appellee notified him of the cancellation of the contract. He asserts the giving of time and service, and his ability and willingness to perform his part of the contract, and that ''the contract was not terminated by mutual consent, or by circumstances beyond the control of the parties.''

He further asserts, that because of the breach he was compelled to seek, and did obtain employment elsewhere; that from January 1, 1935, to the same date in 1936, he was enabled to earn (including payments by appellee) $2,488.75; that by the breach he had been damaged in the sum of $2,461.25, reaching this sum by fixing his prospective pay under the contract, at $4,940, and crediting this by earnings, asked judgment for the difference.

Thereafter appellee (then defendant) answered and counterclaimed, first alleging that due to misrepresentation on the part of appellant, it was induced to enter into the contract. The misrepresentation consisted, as

said, of assurance that appellant had conferred with merchants in the city who had approved the plan to distribute the Guide; that appellee believed that appellant would perform the services necessary to interest retail merchants in the proposed plan, and secure advertisements and hence inserted in the contract the clause above set out. It was also alleged that the company had paid appellant up to February 15, 1935, when it was ascertained that plaintiff had not performed services; that the Merchants Association had agreed that it would not take advantage of the service afforded by the "Shoppers' Guide;" that parties recognized that the Guide could not be published profitably without such support, and upon receiving this information, appellee notified appellant of the cancellation of the contract. We need not concern ourselves with the counterclaim, as there is no cross appeal.

The pleadings were completed by appellant's denial reply, and upon the calling of the case a jury was empaneled, proof was heard, plaintiff by agreement taking the burden. At the conclusion of the proof of plaintiff, the defendant moved for peremptory, which the court overruled. At the conclusion of all the testimony, the plaintiff's motion was renewed, and the court overruled the motion, in so far as it affected the issue raised by the petition and answer, but sustained it as to the issue raised by counterclaim and reply thereto.

The defendant also moved for peremptory in its favor, the court sustaining same, and following an instruction so to do, the jury returned this verdict:

"We the jury in obedience to the instructions of the court find for the defendant Gibbs-Inman Company, on the plaintiff's claim against it, and for the plaintiff M. Lawrence Aronson on the counterclaim of the defendant against him."

Judgment was entered in accordance, and plaintiff moved for a new trial, setting up as grounds the error of the court in directing verdict for the defendant, and the admission of incompetent evidence. This motion was overruled, with appeal granted, and in order to reach a determination of the questions discussed, it is necessary to make reference to the evidence.

The contract before us must be construed in the light of surrounding circumstances at the time of its

execution and thereafter, and all applicable facts, in an endeavor to ascertain the intention of the parties, and thus, if possible, reach a reasonable conclusion as to its effect.

Only three witnesses testified, appellant and Davis for appellant, and Gibbs for appellee, and we may say that the evidence was clean and straightforward, free from any apparent feeling, or with effort other than to get the entire transaction fairly before the court.

It is apparent from the evidence that appellant had capability to perform the services for which he contracted with the printing concern. His long experience in the type of work had qualified him. There is no argument on this question, nor is there doubt of the good faith of both parties in joining together to carry through the Shopping Guide, believing that under certain contingencies it would prove quite profitable.

The testimony shows that the Gibbs-Inman Company, like other printing establishments had met with reverses during years prior to the contract. Gibbs had undertaken to provide some new (to Louisville) enterprise which would bolster the business. He conceived the notion of the Shopper's Guide, and after visiting several large cities where it had been successfully projected, he concluded to try it in his home city, and to this end began negotiations for such equipment as would be necessary to print the Guide.

The general plan was to approach retail merchants and sell them advertising in the Guide, thus calling attention to their wares, special sales, bargains and the like. The Guide was to be printed in large numbers and distributed free to the families in the city; once a week or oftener, if the success of the plan justified it.

Gibbs, recognizing the fact that he was not equipped to carry on the selling end of the proposition, in the latter part of 1934 began to look about for some one qualified to do the soliciting for and procuring the advertisements. He had a conversation with Davis, who while seriously doubting the ultimate success of, and advising against the project, due to a situation existing in Louisville, finally recommended appellant as being the man for the purpose, and later conversations were had which led up to the contract.

It is clear from the proof that those of the retail merchants who constituted the association, comprised more than 60 per cent of the worth-while prospects. However, some of the larger concerns were not members, yet it takes no close reading of the evidence to convince one that the Guide would be a non-profitable enterprise without the association's support. It is not shown, but it might reasonably be doubted that the profits, absent the cooperation of the association, would have been sufficient to pay the minimum guaranteed by contract.

On the subject of the procurement of the association's business, appellant says that it was probably the subject of the preliminary discussion with Gibbs. He says he asked Gibbs if he had appeared before the association and gotten their sanction, and Gibbs replied that "they were all right; they were all for it." He denies that he made the statement to Gibbs that he could "swing the association into line."

After the contract was signed, appellant solicited members of the association, with possibly one or two exceptions, without success. On cross-examination he says he would not say the matter of procuring the association's business was thoroughly discussed, but when Gibbs said it was "all right, I dismissed it from my mind." After the contract was made, appellant reported to Gibbs that "we did not have the approval of the association, which was information I discovered in making my contacts." After this Gibbs went before a meeting of the association without success; in fact there was a definite refusal. It is admitted that on or about February 5, the association resolved: "Our present advertising rule does not permit members to advertise in any Shopper's Guide, and this publication is therefore prohibited as a medium under our rule."

Appellant admits that during the short period he was undertaking to put the project on its feet, he did not secure a single Guide contract. In answer to a question as to whether or not he "considered" the clause which is subject to discussion, he said that he did, and when he asked Gibbs what it meant, he replied: "That does not mean anything; that is just for our mutual protection."

Gibbs, after testifying as to his conception of the Shopping Guide idea, and preparations, including his search for the proper person to build it up, told of his

meeting and conversations with appellant. In so far as the Merchants' Association was discussed, he said that "as a matter of course we touched upon that subject. We knew that the Association held rather a firm grip on the advertising liberties of local merchants." He says he had consulted with some members, perhaps officers, and learned of the "pretty tight situation, due to the antagonistic attitude of certain newspapers." He says appellant assured him that in not more than one month's time he would have the enterprise going. He had prepared what is called a "dummy" of eight pages, showing advertisements, which Gibbs took to represent commitments. He says he told plaintiff he would have a very difficult job. Plaintiff said he was aware of these difficulties, but in view of his standing as an advertising man, and intimate contacts, he could overcome those obstacles, and "he left no doubt that he could go right ahead and put over the shopping news. Otherwise I should not have entered into contract. Rather than telling him that the association would be all right, I told him there would be trouble," and witness gave this as his reason for inserting the language: "Unless sooner terminated by * * * circumstances beyond the control of the parties." He thought, knowing the advertising situation, that it would be a difficult task to shake the "firm stand" as manifested by the later resolution of the association, and that if they were not interested it would create conditions beyond our control," and that this phase was discussed with appellant, "carefully and in detail."

When the news came that the association had declined, witness assured the appellant that the contract would no longer be recognized, to which appellant "demurred and objected," and later several letters passed between the parties, the appellant assuring Gibbs that he would hold the company to the complete contract. On rebuttal Mr. Aronson denied that he had told Gibbs that the Shopper's Guide would get going in about three weeks, or that he told him that he could overcome the matter with the Retailer's Association, as he said, "because he had no connection with the Association."

To us it seems clear that the contract was entered into under a mutual misunderstanding. Aronson believed from Gibbs' conversation that the Association was "all right." Gibbs believed, from what Davis had

said of appellant and from what the latter said, that he could successfully interest the Association. That both believed its cooperation was necessary to ultimate profitable success, there can be no sort of doubt in our minds. Aronson's first thought was whether or not Gibbs had assurances; Gibbs' first thought was that he had secured an agent who could enlist the Association. Both seem to have been mistaken in their beliefs, as it finally developed when the association "resolved."

That the procurement of this cooperation was a matter beyond the control of either party, or in fact beyond their combined efforts, is a question that could hardly be answered except in the affirmative. We need not enter into a discussion of the application of the ejusdem generis rule. It has no application here. The rule has frequently been applied when the term or phrase was coupled with a provision by which a contract might be annulled for some named casualty, or unforeseen active circumstance, and to the extent of determining whether the uncontrollable circumstances were of like or similar kind or character. It will no doubt be admitted that any contract may at any time be cancelled by the mutual agreement of the parties to the contract.

The phrase under discussion is neither meaningless nor ambiguous. The words used are of ordinary and easily understood meaning, and in this case it is only necessary for us to determine whether or not the circumstance which frustrated the plans of the contracting parties, was beyond the control of Gibbs-Inman Company, and incidentally whether or not the language was inserted for the purpose of affording relief or protection, and was so understood by the parties. From what we have said above, the answer is obvious.

In fact, we are somewhat impressed with the assertion of appellee to the effect that, even though the questionable clause had been omitted, the law applicable would have excused either party from performance, under the clearly shown circumstances existing here. A statement of the general rule is found in Straus v. Kazemekas, 100 Conn. 581, 124 A. 234, 238:

"Where from the nature of the contract and the surrounding circumstances the parties from the beginning must have known that it could not be fulfilled unless when the time for fulfillment arrived,

some particular thing or condition of things continued to exist so that they must be deemed, when entering into the contract, to have contemplated such continuing existence as the foundation of what was to be done; in the absence of any express or implied warranty that such thing or condition of things shall exist the contract is to be construed as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible or the purpose of the contract frustrated from such thing or condition ceasing to exist without default of either of the parties.''

In 12 Am. Jur., p. 960, Section 383, the principle is stated:

''An event which substantially frustrates the objects contemplated by the parties when they made the contract, excuses non-performance of the contract. In such a case it is sometimes said that the foundation of the contract is gone.''

In accord with this principle is Section 288, Vol. 1, Am. Law Institute Restatement on Contracts. See also Juett v. Cincinnati, N. O. & T. P. R. Co., 245 Ky. 379, 53 S. W. (2d) 551.

This clause being in the contract, and as we said, not ambiguous, under the circumstances surrounding the making of and effort to carry out the contract, we have no doubt that each party had in mind the thing that might frustrate the undertaking.

Appellant contends that upon conflicting evidence as to whether or not the carrying out of the contract would be or might have been profitable, even without the cooperation of the association, should have been submitted to the jury. The evidence of Gibbs on this point is to the effect that it would not have been. Plaintiff's evidence on this point was merely to the effect that it would have been possible to secure some advertising for the Guide, from the estimated 35 per cent of the city merchants who were not members, but he does not intimate that if he had secured the entire body of non-affiliates, appreciable profit would have resulted.

In his five weeks' work he was enabled to secure or assist in the securing of two advertising contracts, although he contacted ten or more of the larger mercantile

concerns. So, the evidence is not as conflicting as counsel might have us believe. However, appellant is hardly in a position to urge this question here, since from his own proof, and from letters passing between the parties, and the pleading, it is made evident that appellant had no thought of going forward with the venture, but at once sought and secured other employment. There was no discussion between the parties evidencing an intention of either to reform the contract to meet the conditions existing subsequent to February 5, 1935.

With the views expressed above, which coincide with those entertained by the chancellor, we must hold that the court properly advised the jury to return a verdict in favor of defendant.

Judgment affirmed.