Marion HORN, Jr., George Arrington and Fred Arrington, Appellants,

v.

Harry Hale RANIER and Ridgeway Fuel Company, Inc., Appellees.

No. CA–828–MR.

Court of Appeals of Kentucky.

Dec. 23, 1977.

Stanley M. Billingsley, Carrollton, for appellant, Marion Horn, Jr.

Stephen G. Horner, Louisville, for appellants, Fred Arrington and George Arrington.

Charles E. Shivel, Jr., C. Gibson Downing, Stoll, Keenon & Park, Lexington, for appellees.

Before GANT, HOWERTON and WHITE, JJ.

GANT, Judge.

This action involves a series of options, leases, agreements, letters and other documents, most of which were not artfully drawn, concerning certain property and coal in Martin and Lawrence Counties in eastern Kentucky. The appellants are what is generally known in the oil, gas and coal business as "lease hounds"; that is, persons engaged in securing leases for a producer or operator or for themselves and then selling these leases to a producer or operator. Appellees are a coal producing company and the president and sole owner of that company. The two Arringtons are cousins and friends and sometime business associates of Horn.

The time sequence began in early 1974 when Horn was lease hounding for Ranier, who was interested in perfecting a lease on a 1,092-acre tract known as the Nats Creek Lease. Ranier had already acquired a lease for 50% of the minerals under this tract from another owner, the remaining 50% being in the hands of a group referred to collectively as the Kirk heirs. Among these heirs were Gladys Miranda and her husband David, who with other members of her immediate branch of the Kirk heirs and spouses owned a 103-acre tract near Richardson, Kentucky. Although several weeks elapsed between the first documents and the last, the proof clearly discloses that the entire transaction was packaged at the same coun-

ter, wrapped with the same paper and tied with the same ribbon. This package contained the following components, not necessarily in chronological order.

1. An option from Mrs. Miranda and her group to George Arrington to lease the 103-acre tract for the construction of a coal tipple, the option to be for one year. If exercised, George was to pay 20 cents per loaded ton to the lessors.

2. A lease of the Nats Creek property to Ranier containing spaces for 44 signatures but signed by only three persons who owed a total interest of 3.75% of the minerals.

3. A lease of the Big Black Log property containing spaces for the same signatures, signed by only the same three people who, apparently, owned 7.5% of the minerals.

4. A cover letter from the lessors on both the Nats Creek and Big Black log leases stating that these leases were proposals and that the proposals were void unless (a) mining operations commenced within 180 days, and (b) unless all coal from these leases was loaded through the Richardson siding and tipple set out in Paragraph 1, above.

5. An "agreement" between Ranier and appellants to pay the appellants 3% of the gross sales on coal removed from land owned by "the Miranda and Kirk heirs."

6. An "agreement" between Ranier and David Miranda to pay the latter 10 cents per ton on all coal removed by the former from all lands owned by "the Miranda and Kirk heirs."

The consideration for the last two documents was recited as the securing of the lease set out in Paragraph 4, above, and that the appellants and Miranda "will endeavor in the future to assist in securing and delivering additional . . . leases on other lands . . . owned by the Miranda and Kirk heirs . . ." This action was brought by the appellants seeking to recover 3% of the gross sales of coal removed on the Nats Creek Lease, a sum in excess of $51,000, relying on the agreement set out in Paragraph 5 above. On proper motion, a summary judgment for the appel-

lees was entered. The evidence educed at trial reflects that it was necessary to secure the cooperation of the Chesapeake and Ohio Railroad to construct a proper siding on the 103-acre tract in Paragraph 1 before a tipple could be constructed and that the railroad informed Ranier within a few months after the execution of the option in paragraph 1 that it would not construct such a siding and, in fact, one was never constructed. The evidence further disclosed that Ranier had sought a permit from the Commonwealth of Kentucky to mine the Nats Creek property, which permit had been denied because the 53.75% interest was deemed insufficient by the state. When David Miranda contacted Ranier, within six months of the time of execution of the Nats Creek lease, Ranier informed him of the difficulty whereupon Miranda obtained a new lease from the Kirk heirs, signed by 39 of the interest holders. Ranier then secured the permit and mined the property, extracting some 79,000 tons of coal which brought a gross sale price of over $1,700,-000. The appellants had no part whatsoever in securing the second lease.

There are three basic questions presented to us in this case. First, was the shipment of coal through the Richardson siding a condition precedent to the payment of the 3% royalty set out in Paragraph 5 of the listed documents? Second, was this condition precedent, if there was such, impossible to perform to the extent that the royalty agreement could be ignored when the appellants still had six months in which to perform under the option contained in Paragraph 1? Third, was the evidence so clear that a summary judgment was justified?

It is obvious to the court that the loading of the coal over the Richardson siding was a condition precedent. The cover letter by the lessors made that perfectly clear. The exact language was as follows: "We make this proposal providing that any and all coal that we have an interest in must be loaded through, by, or over our Richardson siding premises, according to the terms and tonnage agreed upon in our lease with George

Arrington on the Richardson siding property." Nothing could be clearer. The cover letter even goes on to say that if the Richardson siding lease became null and void, "the whole proposal is to be null and void." The royalty agreement set out in Paragraph 5, above, recited the lease from Miranda, et al. as a part of its consideration. That lease and cover letter were secured and delivered by the appellants, who also were instrumental in preparing them. They knew its contents and import and set out to skim off an additional sum by requiring the coal to be loaded at their own siding. It was they who imposed the condition precedent and then could not perform.

An additional condition is found, although not relied upon by the lower court. The proposed lease required that mining commence within 180 days and further provided that payment under the lease "shall begin no later than 90 days after all the lessors sign lease." When this is considered with the royalty agreements which stated as a part of the consideration therefor that the appellants would "endeavor in the future to assist," there is an indication that before the expiration of the 180 days appellants would perfect the lease to such an extent that mining could commence. The evidence is uncontradicted that appellants did nothing to get other signatures.

Having determined that the use of the proposed Richardson siding was a condition precedent, may the appellees unilaterally make a determination that the condition was impossible to perform and proceed to secure a new lease without regard to the royalty agreement with appellants and without regard to the unexpired status of the tipple option set out in Paragraph 1? It is our opinion that under the circumstances of this case appellees may do so. The fact that the option from Miranda to George Arrington still had time to run is of no consequence when the proof is clear that the construction of the tipple was rendered impossible by an act which was not ascribable to either the promisor or promisee. The case of *Aronson v. Gibbs-Inman*, 283 Ky. 107, 140 S.W.2d 806 (1940) sets out the law in Kentucky as follows:

A statement of the general rule is found in *Straus v. Kazemekas*, 100 Conn. 581, 124 A. 234, 238: "Where from the nature of the contract and the surrounding circumstances the parties from the beginning must have known that it could not be fulfilled unless when the time for fulfillment arrived, some particular thing or condition of things . . . exist(s) so that they must be deemed, when entering into the contract to have contemplated such . . . existence as the foundation of what was to be done; in the absence of any express or implied warranty that such thing or condition of things shall exist the contract is to be construed as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible . . . without default of either of the parties."

The court goes on to adopt the principle that: "An event which substantially frustrates the objects contemplated by the parties when they made the contract excuses nonperformance of the contract. In such a case it is sometimes said that the foundation of the contract is gone." See also *Juett v. Cincinnati, N.O. & T.P.R. Co.*, 245 Ky. 379, 53 S.W.2d 551 (1932) and *Senters v. Elkhorn & Jellico Coal Co.*, 284 Ky. 667, 145 S.W.2d 848 (1940).

Appellants furnished no proof that the siding could or would ever be built by themselves or Chesapeake & Ohio. No competent evidence rebutted the testimony of the railroad official that several persons had sought the siding for years without success, that appellee had tried after the option was given without success, and that the company simply would not build the siding which was necessary for the tipple. Some contention was made that Ranier promised to endeavor to secure the siding. He did just that, but appellants contend that he did not try hard enough. This argument is totally without merit.

The evidence was of such nature that no question remained for the jury and summary judgment was proper. This judgment is affirmed.

All concur.