**Linda GREEN, Plaintiff,**

v.

**Patrick W. McGRATH, et al., Defendants.**

**Civ. A. No. 85–230.**

United States District Court, E.D. Kentucky.

Aug. 26, 1986.

Douglas G. Worrall, Smith, Somerville & Case, Baltimore, Md., Edward S. Bonnie, E. Lambert Farmer, Jr., Brown, Todd & Heyburn, Richard W. Vimont, Anne A. Chesnut, Vimont & Wills, Lexington, Ky., for plaintiff.

Harry B. Miller, Jr., Catesby Woodford, Miller, Griffin & Marks, Lexington, Ky., for defendants.

## MEMORANDUM OPINION AND ORDER

WILHOIT, District Judge.

This is a diversity action between parties having considerable experience in the thoroughbred horse industry and involves the interpretation of a contract dealing with

the breeding of their respective thorough-breds for seasons in 1982, 1983, and possibly 1984.

The plaintiff, Linda Green, owns a farm in Maryland and has been in the horse business since 1962. She holds licenses as an owner and a trainer, raced horses from 1970 to 1980, owns shares in four stallions, and breeds two to five mares per year. The defendants, E. Barry Ryan, Brian Sweeney, and Patrick McGrath, are also knowledgable horse people. Mr. Ryan is a 65–year-old resident of Normandy Farm in Lexington, Kentucky, has been associated with the thoroughbred horse industry since he was a child, trained horses for the 32 years, and has been on the board of directors of the Jockey Club. Ryan has known defendant Brian Sweeney for many years, and the latter gentleman has been associated with race horses since 1961.

Prior to 1982, the three defendants formed a partnership (hereinafter "the Syndicate") for the purpose of purchasing a share in the syndication of the Irish stallion, SHERGAR.

This matter is before the Court on cross-motions for summary judgment. Based on a review of the memoranda of the parties filed in support of their respective motions for summary judgment and the Stipulation of Facts the parties jointly filed subsequent to the pre-trial conference on June 10, 1986, the Court is of the opinion that there are no genuine issues of a material fact involved herein and that as a matter of law, this action is subject to resolution by summary judgment.

Plaintiff seeks an Order from the Court for the defendants to account for all use and benefits which have accrued to them from a thoroughbred colt produced from SHERGAR out of FOREIGN MISSILE, or in the alternative, to enter judgment against the defendants in the amount of $500,000.00.

The record reflects that this action evolved out of the following circumstances:

1. On November 18, 1981, in a Letter Agreement (the contract) signed by the plaintiff and the defendant Ryan, the parties agreed to arrange for the breeding of plaintiff's mare FOREIGN MISSILE to the Syndicate's stallion SHERGAR, standing in Ireland.

2. The mare, FOREIGN MISSILE, was to be transported to Ireland at the Syndicate's expense and would be bred to SHERGAR during the 1982, 1983, and possibly the 1984 breeding seasons. By its own terms, the contract expired no later than the close of the 1984 breeding season.

3. The parties agreed that the first foal produced from the SHERGAR/FOREIGN MISSILE mating would belong to the Syndicate; the second foal would belong to plaintiff. More specifically, the contract provided that if FOREIGN MISSILE should prove to be "barren" from her 1982 cover, she would be again bred to SHERGAR in 1983, in the interest of the Syndicate. Consequently, the 1984 breeding would be for plaintiff's benefit.

On the other hand, if FOREIGN MISSILE produced a foal from her 1982 cover, the 1983 breeding season would be for the plaintiff. If FOREIGN MISSILE proved to be "barren" from the 1983 season, plaintiff would be entitled to a breeding season in 1984, before the contract expired of its own terms at the end of the 1984 breeding season.

4. The 1982 breeding season produced a foal which belonged to the Syndicate and was ultimately sold for $850,000.00.

5. In early 1983, before the 1983 breeding season began, SHERGAR was kidnapped and was never recovered. Thus, any subsequent matings of FOREIGN MISSILE and SHERGAR to produce a foal for plaintiff were rendered impossible due to the disappearance of SHERGAR.

6. When it became apparent that SHERGAR had probably permanently disappeared, or at least was not going to be found in time for the 1983 breeding season, the Syndicate offered to arrange for FOREIGN MISSILE to be bred to an alternate stallion for plaintiff's benefit.

7. Plaintiff decided that she wanted FOREIGN MISSILE bred to GOLDEN FLEECE, a very popular stallion at Cool-

more Stud in Ireland. The popularity of GOLDEN FLEECE was evidenced by the fact that his service fee was 100,000 pounds, 30,000 pounds more than SHERGAR's service fee of 70,000 pounds.

8. The parties agreed that the Syndicate would pay the first 70,000 pounds of the service fee to GOLDEN FLEECE, which was the equivalent to the benefit plaintiff would have received if SHERGAR had been available for service to FOREIGN MISSILE, since SHERGAR's service fee was 70,000 pounds, and plaintiff would pay the remaining 30,000 pounds.

9. Subsequently, FOREIGN MISSILE was bred to GOLDEN FLEECE during the 1983 breeding season and was pronounced to be in foal when examined 100 days thereafter.

10. In November of 1983, FOREIGN MISSILE, while in foal, was shipped from Ireland back to the United States and was boarded at Normandy Farm in Fayette County, Kentucky. On January 31, 1984, FOREIGN MISSILE slipped or aborted the foal.

11. FOREIGN MISSILE remained at Normandy Farm and was subsequently bred to RIVER MAN in March of 1984, for a cost of $63,000.00. Plaintiff later sold FOREIGN MISSILE, while in foal to RIVER MAN, for $1.7 Million.

As the defendants point out, the original agreement between the parties became *impossible* to perform due to the disappearance of SHERGAR. It is well established that when the performance of a contract is based on subject matter, the continuing existence of which is the basis of the contract, performance of the contract is excused when the subject matter of the contract is destroyed or becomes unavailable. 18 *Williston on Contracts*, Section 1948; *Restatement of Contracts (Second)*, Section 261.

The general rule concerning destruction of the subject matter of a contract is set out in *Horn v. Ranier*, 560 S.W.2d 233 (Ky.App.1977), as follows:

A statement of the general rule is found in *Straus v. Kazemekas*, 100 Conn. 581, 124 A. 234, 238: "Where from the nature of the contract and the surrounding circumstances the parties from the beginning must have known that it could not be fulfilled unless when the time for fulfillment arrived, some particular thing or condition of things ... exist(s) so that they must be deemed, when entering into the contract to have contemplated such ... existence as the foundation of what was to be done; in the absence of any express or implied warranty that such thing or condition of things shall exist the contract is to be construed as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible ... without default of either of the parties."

The court goes on to adopt the principle that: "An event which substantially frustrates the objects contemplated by the parties when they made the contract excuses nonperformance of the contract. In such a case it is sometimes said that the foundation of the contract is gone."
*Horn v. Ranier*, 560 S.W.2d at 235.

■ Furthermore, nonperformance of the contract is excused regardless of whether the unavailability of the subject matter is caused by the malicious act of a third person of by an "act of God". *Tennessee Electric Power Company v. White County*, 52 F.2d 1065 (6th Cir.1931); 18 *Williston on Contracts*, Section 1936.

Therefore, based on the fact that the disappearance of SHERGAR was legally tantamount to the destruction of the subject matter of the parties contract concerning FOREIGN MISSILE's service to SHERGAR, the defendants correctly contend that legally they could have done nothing to alleviate the unfortunate turn of events and would have incurred no liability to plaintiff. However, since the Syndicate had received a foal from the 1982 cover between FOREIGN MISSILE and SHERGAR, per the terms of their contract, the Syndicate felt a "moral" obligation to try to help plaintiff arrange for an alternate stallion of plaintiff's choice for service to FOREIGN MISSILE. Consequently, the Syndicate offered her the amount of

SHERGAR's stud fee (70,000 pounds) against the stud fee of the stallion plaintiff chose for FOREIGN MISSILE.

Plaintiff chose GOLDEN FLEECE, and on April 14, 1983, a Nomination Agreement was entered into by defendant Brian Sweeney, on plaintiff's behalf, which provided that the nomination fee of 100,000 pounds was payable, as follows:

> ... on the 1st October following the end of the said covering season unless the Purchaser produces for inspection on or before the said date a certificate signed by a qualified veterinary surgeon dated at least 40 days after the Mare's last service by the Stallion to the effect that the Mare has been found *barren;* (emphasis added).

To reiterate, FOREIGN MISSILE was examined on the 100th day following her last service to GOLDEN FLEECE and was pronounced to be in foal. She was shipped to Normandy Farm in foal in November of 1983, and she remained in foal until January 31, 1984, when she aborted the foal.

Plaintiff argues that originally the parties intended to permit rebreeding on behalf of each party unless a live foal resulted from the cover. She takes the position that regardless of the express language of their contract, the parties intended their contract to be a "live foal" contract rather than a "no guarantee" contract.

■ The pertinent contract language provides as follows:

> If FOREIGN MISSILE should be barren from her 1982 cover, she will be rebred in 1983 in the interest of the Syndicate and rebred in 1984 in the interest of Green with no nomination fee.

> If FOREIGN MISSILE is bred in 1983 in the interest of Green and should prove to be barren, she will be rebred in 1984 in Green's interest without nomination fee.

In view of the fact that (1) the term "live foal" is absent from this contract, and (2) the contract expressly stated that it would "terminate not later than the close of the 1984 breeding season", the Court finds it difficult to understand how plaintiff, as an experienced horse person, could logically conclude that the parties had agreed to a "live foal" contract.

In essence, it appears that based on the contractual language, the Syndicate was given up to two breeding seasons in which to obtain a foal; if FOREIGN MISSILE were *barren* from the 1982 cover, the Syndicate also had the rights to the 1983 breeding season. Depending on the outcome of the 1982 breeding season, plaintiff had one and possibly two breeding seasons, but only a maximum of two breeding seasons, in which to obtain a foal; if FOREIGN MISSILE produced a foal from the 1982 cover, plaintiff had the rights to the 1983 breeding season; however, if FOREIGN MISSILE proved to be *barren* from the 1983 cover, plaintiff had one more chance at a foal from the 1984 season before the contract expired by its own terms at the close of the 1984 breeding season.

■ Since the 1982 cover was successful and the Syndicate received a foal, the next two breeding seasons potentially belonged to plaintiff; however, these potential breeding seasons failed to materialize due to the disappearance of SHERGAR; thus, performance of the original contract became impossible.

Plaintiff claims that the definition of the word "barren", as defined in *Keck v. Wacker*, 413 F.Supp. 1377 (E.D.Ky.1976), does not define "barren" for purposes of this action. In *Keck, supra,* Judge Eugene E. Siler, now Chief Judge of this Court, held:

> All parties agree and the Court finds that "barren" means "bred and did not conceive" and "slipped" means "bred, conceived and then aborts the foal."

*Keck v. Wacker,* 413 F.Supp. at 1381.

In conjunction with the foregoing definition of "barren", the Court observes that *The American Heritage Dictionary Of The English Language* (1981 Edition), at page 109 defines "barren" as follows:

> bar-ren: 1.a. Not producing offspring; childless or fruitless. b. Incapable of producing offspring; infertile; sterile. 2. Lacking vegetation....

In relation to the meaning that should be attached to the word "barren" and the

terms of the contract, the defendants call the Court's attention to *O.P. Link Handle Company v. Wright*, 429 S.W.2d 842 (Ky. 1968), wherein the court addressed the argument that the language in an unambiguous written contract should be avoided as follows:

But when two intelligent parties have read the contract before signing it, and one thereafter says it meant something different, or was subject to some unexpressed condition, reservation, limitation, provision, or understanding, but the other says it meant just what said, no more and no less, it is our opinion that stability and a salutary confidence in the written word requires the instrument itself to prevail.

"Under the guise of interpretation, courts are repeatedly importune to give a meaning to the writing under consideration which is not to be found in the instrument itself, but which is based entirely on direct evidence of intention. And just as steadfastly, the courts [this court, at least] reiterate the well established principle that it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make."

*Id.*, at 847, quoting *Williston on Contracts*, Third Edition, Section 610A (Vol. 4, p. 513).

The Court finds that the word "barren" is not ambiguous. Therefore, being presented with an unambiguous contract, as noted in *Snyder v. Travelers' Fire Insurance Company*, 282 Ky. 555, 138 S.W.2d 1036, 1038 (1940), the Courts are bound to "construe contracts and not to construct them." In *Blue Diamond Coal Company v. Robertson*, 243 Ky. 584, 49 S.W.2d 335, 336 (1932), the court noted that a contract must be construed "according to its tenor and terms and not by the evidence of what was in the mind of one of the parties." Therefore, the fact that one party may have intended a different result is insufficient to alter the plain and unambiguous terms of a written contract.

In view of the fact that (1) the term "live foal" is conspicuously absent from the con-

tract and the word "barren" is incorporated therein in two different provisions, and (2) all parties to the contract were knowledgeable, experienced horse people, the Court is inclined to hold that the contract must be interpreted as meaning precisely what it says and finds no merit in plaintiff's argument that it should be accorded a different meaning than what is expressly stated.

Plaintiff also argues that she and the Syndicate entered into a joint adventure requiring fair dealing, and that she is entitled to recovery because she believed she was guaranteed a live foal. However, a review of the contract indicates that the parties at the time of contracting chose to call their transaction a horse lease, as evidenced by the following term:

The Syndicate desires to lease your mare, FOREIGN MISSILE, 1973 bay mare by Damascus, out of Queen Of The Sky, for the breeding season of 1982 for One ($1.00) Dollar and other considerations.

Accordingly, it appears to the Court that part of the consideration flowing to plaintiff from the lease of FOREIGN MISSILE to the Syndicate was the opportunity to obtain for herself a foal produced by the breeding of FOREIGN MISSILE and SHERGAR after the Syndicate had obtained its foal from an earlier cover. However, plaintiff's opportunity was thwarted by the untimely disappearance of SHERGAR.

In relation to the original contract, plaintiff asserts that she is entitled to recovery because she believed this contract to be a "live foal" contract. However, as previously stated, the Court finds no merit in this argument. In examining the contingencies incorporated in the original contract, it is clear that there was no "live foal" agreement, as evidenced by these facts: (1) the contract expired by its own terms at the close of the 1984 breeding season; (2) the Syndicate had up to two breeding seasons in which to try and obtain a foal (1982 and 1983); (3) if it had been necessary for the Syndicate to utilize both the 1982 and 1983 breeding seasons, plaintiff would only have been entitled to the 1984 breeding season,

with no right to a subsequent breeding season in 1985 if FOREIGN MISSILE should prove to be barren from the 1984 cover.

Accordingly, the Court must find that the parties' original contract was a "no guarantee" contract.

Although plaintiff concedes that performance of the original contract was rendered impossible by the disappearance of SHERGAR, she still maintains that she is entitled to damages under theories of unjust enrichment, executory accord, or modified contract.

■ Concerning plaintiff's allegation that defendants have been unjustly enriched by their contract, the defendants point out that had performance of the contract not been rendered impossible, the contract was even-handed in its application. If everything went as planned, both plaintiff and the Syndicate would have received a foal from the cover of SHERGAR and FOREIGN MISSILE. The parties did not agree to joint ownership of two different foals; they chose to agree that the Syndicate would own the first foal and plaintiff would own the second foal. The record indicates that the parties knowingly and intelligently fashioned this contract in such a manner.

Furthermore, the parties agreed that the Syndicate would pay all of FOREIGN MISSILE's boarding charges up until the time the Syndicate had a weaned foal, at which time plaintiff would be responsible for the boarding charges, which would have been at the time when FOREIGN MISSILE was visiting SHERGAR for the purpose of producing a foal for the plaintiff.

Subsequent to the disappearance of SHERGAR, when the Syndicate set about to try to alleviate plaintiff's unfortunate situation, the Syndicate offered to contribute 70,000 pounds (SHERGAR's stud fee) toward the stud fee of GOLDEN FLEECE, with plaintiff paying the difference of 30,000. Plaintiff accepted this offer, and there was a GOLDEN FLEECE/FOREIGN MISSILE mating, from which a pregnancy occurred.

It is unfortunate that SHERGAR disappeared before plaintiff could receive a foal from him; however, SHERGAR's inopportune disappearance does not mean that the defendants have been unjustly enriched at the expense of the plaintiff. The disappearance of SHERGAR has adversely affected all parties to this action. The Court simply cannot find merit in plaintiff's contention of unjust enrichment.

■ Likewise, the Court is equally unimpressed with plaintiff's theories of recovery under executory accord and modified contract. Plaintiff is again attempting to argue that the service of FOREIGN MISSILE to GOLDEN FLEECE was a "live foal" contract. This position is refuted by the fact that the original contract was not a "live foal" contract. As the contingencies therein point out, the SHERGAR/FOREIGN MISSILE contract was a "no guarantee" contract. Therefore, the Court is hard-pressed to accept the argument that the arrangement to breed FOREIGN MISSILE to GOLDEN FLEECE, as an accomodation to the plaintiff by the Syndicate, was a "live foal" contract.

Moreover, plaintiff's contention that the second contract was a "live foal" contract is belied by the acts of the parties subsequent to the time when FOREIGN MISSILE was pronounced to be in foal from GOLDEN FLEECE. After it had been determined that FOREIGN MISSILE was in foal, FOREIGN MISSILE was shipped back to the United States in November of 1983, while still in foal.

■ Consequently, it is quite clear that the alternate arrangement entered into by the parties was also a "no guarantee" contract, just as the original contract. If it had been a "live foal" contract, FOREIGN MISSILE would not have been shipped back to the United States until her pregnancy came to term resulting in a live foal. If the parties had entered into a "live foal" contract with either SHERGAR or GOLDEN FLEECE, it would have been necessary for FOREIGN MISSILE to remain in Ireland until a foal was born. Allowing plaintiff up to a maximum of two breeding seasons, as specified in the original con-

tract, if the parties had agreed to a "live foal" contract, and FOREIGN MISSILE slipped or aborted her foal, plaintiff would be entitled to a second breeding season.

Therefore, plaintiff cannot now be heard to say that she had a "live foal" contract with either SHERGAR or GOLDEN FLEECE, when the behavior of the parties expressly demonstrates otherwise.

Having reviewed the record and the exhaustive memoranda of the parties, the Court is of the opinion that there are no genuine issue of any material fact and that the defendants are entitled to summary judgment as a matter of law.

The Court being sufficiently advised,

IT IS HEREBY ORDERED AND ADJUDGED, as follows:

1. Plaintiff's motion for summary judgment is DENIED.

2. Defendants' motion for summary judgment in their favor is GRANTED, and plaintiff's complaint be and the same is DISMISSED WITH PREJUDICE, at plaintiff's cost.

3. This action is STRICKEN from the docket, and there being no just cause for further delay, this is a final and appealable order.