RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GGNSC LOUISVILLE HILLCREEK, LLC; GGNSC
ADMINISTRATIVE SERVICES, LLC; GGNSC CLINICAL
SERVICES, LLC,

*Petitioners-Appellants*,

No. 18-6059

*v.*

ESTATE OF ROBERT C. BRAMER, by and through
Margaret A. Bramer, Administratrix; MARGARET A.
BRAMER, individually,

*Respondents-Appellees*.

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:17-cv-00439—David J. Hale, District Judge.

Argued: April 30, 2019

Decided and Filed: August 2, 2019

Before: MERRITT, MOORE, and WHITE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Edward M. O'Brien, WILSON ELSER MOSKOWITZ EDELMAN & DICKER,
LLP, Louisville, Kentucky, for Appellants. Jennifer A. Moore, GROSSMAN & MOORE,
PLLC, Louisville, Kentucky, for Respondents. **ON BRIEF:** Edward M. O'Brien, Marcia L.
Pearson, WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP, Louisville, Kentucky,
for Appellants. Jennifer A. Moore, GROSSMAN & MOORE, PLLC, Louisville, Kentucky, for
Respondents. Maame Gyamfi, AARP FOUNDATION, Washington, D.C., for Amicus Curiae.

————————————

**OPINION**

————————————

MERRITT, Circuit Judge.  This case is about nursing homes and the rights their residents surrender should they consent to arbitration.  The question presented is whether the estate of a deceased nursing home resident must arbitrate its dispute with the nursing home.  Arbitration rests on consent, and the District Court concluded there was none.  We agree and **AFFIRM**.

## I. FACTUAL & PROCEDURAL BACKGROUND

Robert C. Bramer was admitted to a Kentucky nursing home called Golden Living Center – Hillcreek multiple times over the course of eighteen months in 2015 and 2016.  *See GGNSC Louisville Hillcreek, LLC v. Estate of Bramer*, No. 3:17–CV–439–DJH, 2018 WL 4620968, at *1 (W.D. Ky. Sept. 26, 2018) (District Court Opinion).  During his final stay, he fell out of bed, sustained a head injury, and later died.  His estate alleges that the nursing home did not adequately care for Robert and hastened his death.  In June 2017, Robert's estate and his widow sued the company operating the nursing home in Kentucky state court, alleging negligence, negligence *per se*, violations of Kentucky's Residents' Rights Act, KRS 216.515(26), corporate negligence, medical negligence, wrongful death, and loss of consortium.[1]

In July 2017, the nursing home defendants filed a petition to enforce an arbitration agreement against the estate in federal court.  Practically, this meant that the parties flipped: the state court plaintiffs became respondents in federal court, and the state court defendants became the petitioners in federal court.  The point of the petition to enforce arbitration was to ask the District Court whether the allegations in the state court complaint should go to arbitration rather than a Kentucky jury.  The nursing home claims that the parties executed arbitration agreements, while the estate says those agreements are invalid.  In this stage of litigation, we are determining

---

[1]The plaintiffs in state court were the estate of Robert Bramer, represented by his wife Margaret Bramer as executrix, and Margaret Bramer individually.  The defendants in state court were the corporate entities operating the nursing home: GGNSC Louisville Hillcreek, LLC, d/b/a Golden Living Center – Hillcreek; GGNSC Administrative Services, LLC; GGNSC Clinical Services, LLC; Hillcreek Leasing, LLC, d/b/a Hillcreek Rehabilitation and Care; and Chris Malvern, in her capacity as administrator of Golden Living Center – Hillcreek.

only *where* the estate's claims against the nursing home will be decided.  The District Court agreed with the estate that no valid agreement covering the final visit existed.  2018 WL 4620968, at *4.

Robert Bramer was admitted to Hillcreek on three occasions: (1) January 5, 2015; (2) January 26, 2015; and (3) July 13, 2016.  Each time Hillcreek admitted Bramer, it presented him with an "admissions packet."  One of these documents was a contract styled "Alternative Dispute Resolution Agreement."  The nursing home's practice was to re-present the same admissions packet upon each new admission to the nursing home, even if the person had been admitted before.  So three different copies of the same contract—the Alternative Dispute Resolution Agreement—are in the record.  The Bramers' assent, or non-assent, to these agreements is the focus of this case.

The parties disagree on this basic issue: whether the Alternative Dispute Resolution Agreements are signed.  The first Agreement of January 5, 2015 displays a mark of some kind in the "Signature of Resident" block, but it is difficult to read.  Bramer's estate alleges that this illegible scrawl is a forgery, and Margaret Bramer stated in an affidavit that neither she nor Robert signed that form.  As to the second Agreement dated January 26, 2015, Margaret Bramer signed in the "Signature of Resident" block even though Robert was the Resident.  The parties agree that the third Agreement of July 13, 2016 is unsigned.  2018 WL 4620968, at *1.

The Alternative Dispute Resolution Agreements are identical and require signatories to arbitrate a wide range of disputes. [2]  2018 WL 4620968, at *1–2 (quoting contract).  Although signing the Agreement was not a condition of admission to the nursing home, it was presented as part of the admissions packet.  The estate presented evidence that nursing home staff implied that signing the Agreement was required.  R.17-2.[3]  Because the Agreement binds a signatory's successors and assigns, it applies to the estate.  Importantly, the Agreement contains a remain-in-effect clause:

---

[2]Margaret Bramer's claims for wrongful death and loss of consortium are not arbitrable.  *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 600 (Ky. 2012).  The nursing home concedes this issue.  Appellants' Reply Brief at 18, n.4.

[3]Record citations refer to the docket before the District Court.

> The Resident understands that he or she has the right to seek advice of legal counsel concerning this Agreement; that his or her signing of this Agreement is not a condition of admission to or residence in the Facility; that he or she may revoke this Agreement by sending written notice to the Facility within thirty (30) days of signing it; and that *this Agreement, if not revoked within that time frame, shall remain in effect for all care and services rendered to the Resident at or by the Facility regardless of whether the Resident is subsequently discharged and readmitted to the Facility without renewing, ratifying, or acknowledging this Agreement.*

R.23-3, Page ID 708, § IX (emphasis added). The separate Admission Agreement (a different document in the admissions packet) explicitly referenced the Alternative Dispute Resolution Agreement and said: "[I]f you execute, or have executed, an Alternative Dispute Resolution Agreement with us in connection with any admission to our Living Centers, then that Agreement shall be, and remain, binding upon you, and upon us, in accordance with the terms that are set forth in that Agreement." 2018 WL 4620968, at *3. When a person admitted to a nursing home signs the Alternative Dispute Agreement, she surrenders the right to a trial by jury on claims she might have against the nursing home. And in fact, Bramer's estate and his widow are seeking that very jury trial on claims against the nursing home based on alleged negligence leading to Robert's premature death.

After the nursing home filed the Petition to Arbitrate in federal court, the parties engaged in motions practice for some months before the District Court took the matter under advisement. In September 2018, the District Court issued a memorandum opinion denying the nursing home's petition to arbitrate and dismissing the case. 2018 WL 4620968, at *4. The nursing home appealed.

## II. LEGAL ANALYSIS

Establishing that a valid agreement exists is the first step in evaluating a petition to arbitrate, and the initial burden is on the party seeking to enforce the agreement to produce a written, signed document. *MHC Kenworth-Knoxville/Nashville v. M & H Trucking, LLC*, 392 S.W.3d 903, 905–06 (Ky. 2013). Our review of a District Court's decision on whether to compel arbitration is *de novo*. *GGNSC Louisville St. Matthews LLC v. Badgett*, 728 F. App'x 436, 439 (6th Cir. 2018). The crux of this case is the effect of the third Agreement on the

previous Agreements. If Margaret and Robert's refusal to sign the third Agreement was an act of contractual significance, then the disputes about the validity of the first two Agreements do not matter. The District Court took this exact approach in analyzing the case. 2018 WL 4620968, at *3. We agree with the District Court and adopt its analysis below. We begin with basic principles of consent to arbitration.

## A. Arbitration

The Federal Arbitration Act, 9 U.S.C. § 2, mandates that, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). The Act, in relevant part, declares:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. A subsequent section of the Act, 9 U.S.C. § 4, allows a District Court to compel arbitration should either party refuse to comply with a valid arbitration agreement. The use of arbitration agreements in nursing homes is widespread. *See generally* Marjorie A. Shields, Annotation, *Validity, Construction, and Application of Arbitration Agreement in Contract for Admission to Nursing Home*, 50 A.L.R.6th 187 (2009).

An agreement to arbitrate is fundamentally a matter of consent. *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 504 (6th Cir. 2007); 4 Am. Jur. 2d *Alternative Dispute Resolution* § 48 (1998) ("[B]ecause arbitration involves a waiver of the right to pursue a case in a judicial forum, the courts take particular care in assuring the knowing assent of both parties to arbitrate, and a clear mutual understanding of the ramifications of that assent."). The Supreme Court's jurisprudence has made consent the cornerstone of arbitration. "While ambiguities in the language of the agreement should be resolved in favor of arbitration . . . we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply

because the policy favoring arbitration is implicated." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *see also United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").

This sounds like the familiar language of hornbook contract law because it is. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) ("[The Federal Arbitration Act] embodies the national policy favoring arbitration and places arbitration agreements *on equal footing* with all other contracts[.]") (emphasis added). We use state law to assess the existence of an agreement. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009) (citation omitted); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.") (citations omitted); *see also Badgett*, 728 F. App'x at 440.

The instant matter is a not a case mining the vagaries of "ambiguities in the *language* of the agreement." *Waffle House*, 534 U.S. at 294 (emphasis added). It is, like *Badgett*, an inquiry into basic consent. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986) ("[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration."); *United Steelworkers of Am., Local No. 1617 v. Gen. Fireproofing Co.*, 464 F.2d 726, 729 (6th Cir. 1972) ("Nevertheless, arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration."). The most basic question is at issue: does a valid agreement to arbitrate cover the final (and disputed) admission to the nursing home?

**B. Assuming the Validity of the First Agreements, the Parties Abandoned Them**

The focus of this case is consent. To evaluate whether consent exists, one approach would be to analyze each of the three Agreements in the record independently; this would include exploring the allegations of forgery as to first Agreement (illegible scrawl), and agency as to the second Agreement (where Margaret Bramer signed on the wrong line as resident). But there is an easier path – the one chosen by the District Court. Even if the earlier Agreements are

enforceable, the parties' actions upon the third admission carry legal significance. 2018 WL 4620968, at *4 ("Thus, regardless of the enforceability of the January 2015 Arbitration Agreements, no agreement to arbitrate covers Robert's July 2016 stay at Hillcreek.").

For the purposes of this opinion we assume that the first two Agreements had *some* contractual effect.[4] If we accept that the parties had already agreed to arbitrate their disputes, the key question is whether re-presenting the identical contract affected the prior Agreements. We can reach no conclusion other than that re-presenting the contract to the Bramers was behavior unmistakably showing that no prior agreement controlled. As in the instructive *Badgett* case, the nursing home here presented the resident-admittee with the same choice multiple times. 728 F. App'x at 442. This action by the nursing home had a legal effect. *Id.* ("By offering Badgett a choice, GGNSC indicated its intent to extinguish the first agreement by substituting it with a new agreement."). In *Badgett*, the precise legal effect of that action was a novation. *Id.* at 443.

In this case, the legal effect is abandonment. "[W]here it is claimed that by reason of inconsistency between the terms of a new agreement and those of the old the old one is discharged, the fact that such was the intention of the parties must clearly appear." 17B C.J.S. *Contracts* § 598. The same contract—with identical terms—was presented to the Bramers three times. Each contract said that it would last in perpetuity and apply to each subsequent admission. "The proper interpretation of GGNSC's objective intent is that it again offered Badgett the choice of whether to submit to arbitration." *Badgett*, 728 F. App'x at 442. Is the Bramers' decision to forego signing the third contract a rescission, discharge, or abandonment of the prior contracts? Put differently in the language of offer and acceptance, does rejecting a new offer that is identical to an older offer terminate acceptance of the prior offers in a contract for arbitration? It is elementary that refusing to sign a contract is fundamentally at odds with

---

[4]This is an extremely dubious proposition for three reasons. First, the affidavits submitted by Bramer and her expert as to the validity of the signature on the first Agreement clearly show a genuine issue of material fact. *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). Next, as to the second Agreement, Margaret Bramer signed as "Resident" even though she was not the resident. This presents a complex agency issue. *See generally Ping*, 376 S.W.3d at 594; *New Meadowview Health & Rehab. Ctr., LLC v. Booker*, 550 S.W.3d 56, 60 (Ky. Ct. App. 2018). Third, these Agreements are contracts without fixed duration; Kentucky disfavors such contracts. *See Mid-S. Toyota, Ltd. v. Bug's Imports, Inc.*, 453 S.W.2d 544, 549 (Ky. 1970); *Brownsboro Rd. Rest., Inc. v. Jerrico, Inc.*, 674 S.W.2d 40, 41 (Ky. Ct. App. 1984); *see also* 17B C.J.S. *Contracts* § 602. By re-presenting the exact same contract to a resident upon each admission, the nursing home unequivocally implied that the Agreement did *not* extend in perpetuity. This raises a formation problem under state law.

assenting to the terms of that contract. The effect of the Bramers' refusal to sign the third Agreement was that no contract was formed, and the earlier contracts were abandoned. This basic give-and-take of acceptance and rejection is the bedrock of contract law. The refusal to sign in this case is the same as Badgett's choice to sign below the line declining arbitration. *Id.*

"[F]or purposes of rescission, a meeting of the minds may be shown by the conduct of one party inconsistent with the continued existence of a contract, or abandonment or repudiation of the contract, and knowledge of, and acquiescence to, such abandonment or repudiation by the other." 17B C.J.S. *Contracts* § 591. Presenting an identical agreement in the admissions packet is an act fundamentally inconsistent with the continued existence of an earlier identical agreement. *Texaco, Inc. v. Debusk*, 444 S.W.2d 261, 263 (Ky. 1969) (quoting 17A Am. Jur. 2d *Contracts* § 517 (1998)). In this case, the nursing home lumped its Alternative Dispute Resolution contract in with other admissions documents thrust at any person walking through its doors. But each new presentation of the contract constituted a new offer that is inconsistent with a contract being in force. The nursing home wants it both ways: it wants the Agreement to mean something when it treated it as though it did not. *Cf.* William S. Haynes, KENTUCKY JURISPRUDENCE: *Contracts* § 24-3 p. 358 (1986) ("[W]hen a party commits acts which are inconsistent with the existence of a formal contract . . . when accompanied by a manifestation of intent by the person entitled to performance of the duties arising from the contract to discharge them, the obligation thereunder will be deemed to have been discharged.").

If the Agreement is a contract that stays in force upon each successive admission—and the Supreme Court has said clearly that the normal rules of contract apply to arbitration contracts—then the actions of these parties at the third admission clearly bespeak a mutual intent to abandon the Agreement. Assume the Bramers had clearly signed the same contract on each of the three occasions Mr. Bramer was admitted. In that case, the newest of the contracts would control. That was the essence of our holding in *Badgett*. 728 F. App'x at 442–43 ("In the second arbitration agreement, both parties substituted their prior obligation to arbitrate disputes with a new agreement that allowed them to litigate disputes."). This was so because each of these arbitration agreements is so comprehensive as to deal with the entire issue of alternative

dispute resolution between the parties, forever; that is what these contracts say.  *See* 17B C.J.S. *Contracts* § 597 ("[M]aking subsequent contracts that deal with the same subject matter as the earlier contracts does not abrogate the previous instruments unless the subsequent contract . . . deals with the subject matter of those instruments so comprehensively as to be complete within itself.").

If the Agreement is so comprehensive that it binds the parties to arbitration forever, then why did it need to be presented upon each successive visit?  This does not bespeak an intent to ratify but an intent to offer the same choice again to the re-admitted resident.  Otherwise re-presentment simply offers the resident a choice they are not contractually allowed to make, or a choice that is meaningless.  "This construction would be contrary to the fundamental rule that a written agreement should 'be construed as a whole, giving effect to all parts and every word in it if possible.'"  *Badgett*, 728 F. App'x at 442 (quoting *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986)); *see also* 4 Am. Jur. 2d *Alternative Dispute Resolution* § 107 (1998) ("Waiver of an arbitration clause may be established . . . by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary.").  When the parties' "positive and unequivocal" actions are inconsistent with a contract's existence, the intent of both parties is to discard the contract. *Carter v. Carter*, 656 S.W.2d 257, 258 (Ky. Ct. App. 1983).[5]

Kentucky law is clear that we must effectuate the intent of the parties.  *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002).  And we are sure of the cardinal principle that a contract may be cancelled by mutual consent.  *Aronson v. Gibbs-Inman Co.*, 140 S.W.2d 806, 809 (Ky. Ct. App. 1940) ("It will no doubt be admitted that any contract may at any time be cancelled by the mutual agreement of the parties to the contract."); *see also Glazer v. Lehman Bros. Inc.,* 394 F.3d 444, 460 (6th Cir. 2005) ("It is a fundamental precept of contract law that parties may agree to discharge or terminate a contract in favor of creating a

---

[5]In *Carter*, a husband and wife tore up their antenuptial agreement.  The Kentucky Court of Appeals said: "Like tossing a document into a fire, tearing up a document is clearly a positive and unequivocal act inconsistent with the continued existence of the written contract."  656 S.W.2d at 258 (citation and quotation marks omitted). Re-presenting an identical contract may not be as melodramatic as tearing up an antenuptial, but presuming that a valid contract already existed, it is an act wholly without purpose.  We will not dismiss the nursing home's re-presentation as mere bureaucratic enthusiasm.

second agreement to replace the former, and, when that occurs, the initial agreement is superseded and is no longer enforceable as to any party thereto.").

Similarly, arbitration rights can be waived mutually on an implied basis. *See Netherwood v. Kennedy*, No. 2008–CA–001508–MR, 2010 WL 5018154, at *2 (Ky. Ct. App. Dec. 10, 2010) ("Since arbitration rights are contractual in nature, they may be waived."); *Valley Const. Co. v. Perry Host Mgmt. Co.*, 796 S.W.2d 365, 367 (Ky. Ct. App. 1990); *see also* 6 C.J.S. *Arbitration* § 86 ("The parties to an arbitration may, by agreement or *action*, expressly or implicitly waive or abandon the arbitration agreement.") (emphasis added). A party's actions matter: a party to a contract may not act as though an agreement does not exist and then seek the benefit of that bargain later. *Cf. Mattingly-Lusky Realty Co. v. Camper*, 15 S.W.2d 240, 241 (Ky. Ct. App. 1929) ("The cancellation or rescission of an executory contract must be through a meeting of minds the same as the making of it. But such concurrence may be evidenced by the acts of the parties as well as by their expressed language.").

Here, each party took an action with legal significance. The nursing home was not required to present the Bramers with a new agreement, but did. *Badgett*, 728 F. App'x at 442; *see also GGNSC Louisville St. Matthews, LLC v. Badgett*, No. 3:17–CV–00188–TBR, 2017 WL 3097534, at *5 (W.D. Ky. July 20, 2017) (*Badgett* District Court Opinion) ("In other words, under their construction, Petitioners offered Badgett nothing more than the *appearance* of choice.") (emphasis in original). And by electing not to sign the new agreement, the Bramers acquiesced in the nursing home's abandonment of the earlier agreement. *Badgett*, 2017 WL 3097534, at *4 ("Badgett's decision to reject an identical agreement manifests his intent to have his claims against GLC St. Matthews decided by a jury."). As the District Court below said, "[t]hus, regardless of the enforceability of the January 2015 Arbitration Agreements, no agreement to arbitrate covers Robert's July 2016 stay at Hillcreek." 2018 WL 4620968, at *4. Because there was no agreement, we affirm the District Court's denial of the nursing home's petition.

### III. CONCLUSION

The nursing home offers a slew of inapposite cases to attack the District Court's conclusions. Its only other main argument construes the District Court's decision as violating a constitutional right to arbitration. Appellants' Brief at 14 (referencing the Kentucky Constitution). The federal policy favoring arbitration does not mean that the entity seeking to arbitrate wins every time. Our interpretation, like the District Court's, rests on the most basic principles of contract formation. Appellants' attempts to distinguish *Badgett* only persuade us that the two cases are analogous.

Our conclusion that a contract was not formed does not bespeak judicial intent to subvert arbitration. *Cf. Badgett*, 728 F. App'x at 443 ("Similarly, we are not moved by GGNSC's argument that any ambiguity should be resolved in favor of arbitration because that argument does not take into account the first step of determining whether the parties agreed to arbitrate a dispute and the scope of the agreement."); *Pine Tree Villa, LLC v. Brooker*, 612 F. App'x 340, 345 (6th Cir. 2015) ("The district court's refusal to enforce the arbitration agreement against Elfrig's estate was based not on the arbitral nature of the agreement but, instead, on the fact that entry into the agreement was voluntary and that the [Power of Attorney] did not provide a general authority to Joy Brooker to contract on Elfrig's behalf."); *Kindred Nursing Ctrs. Ltd. P'ship v. Butler*, No. 2013–CA–000880–MR, 2014 WL 3722083, at \*4 (Ky. Ct. App. July 25, 2014) ("Accordingly, the trial court's analysis as to whether a valid agreement had been entered into between [nursing home] and [resident] rests squarely on determining the validity of the arbitration agreement and was not, contrary to the assertions of [nursing home], done to disfavor arbitration or show hostility toward arbitration.").

Denying the petition to arbitrate does not mean that Margaret Bramer and Robert Bramer's estate will prevail on any of their claims. Our ruling simply means that there was no valid agreement to arbitrate the dispute. Guided by *Badgett* and the persuasively reasoned opinion of the District Court, we **AFFIRM**.