RENDERED: JANUARY 10, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1338-MR

LP LOUISVILLE QUINN DRIVE, LLC
D/B/A SIGNATURE HEALTHCARE
AT ROCKFORD REHAB AND WELLNESS
CENTER; LPO HOLDINGS, LLC; AGEMO
HOLDINGS, LLC; LPSNF, LLC; SIGNATURE
HEALTHCARE CLINICAL CONSULTING
SERVICES, LLC; JJLA, LLC; SIGNATURE
HEALTHCARE CONSULTING SERVICES, LLC;
SHC KY HOLDINGS, LLC; SHC LP HOLDINGS II,
LLC; SIGNATURE HEALTHCARE, LLC; LAS
PALMAS SNF, LLC; LP MANAGER, LLC;
LPMM, INC.; AND TRINA M. MANUEL-JAGOE
IN HER CAPACITY AS ADMINISTRATOR OF
SIGNATURE HEALTHCARE AT ROCKFORD
REHAB AND WELLNESS CENTER                                         APPELLANTS


                         APPEAL FROM JEFFERSON CIRCUIT COURT
v.              HONORABLE MELISSA LOGAN BELLOWS, JUDGE
                              ACTION NO. 20-CI-006128


BARBARA LEONARD-RAY, AS
ADMINISTRATRIX OF THE ESTATE
OF ROCKFORD SMITH                                                      APPELLEE

<u>OPINION</u>
<u>REVERSING AND REMANDING</u>

** ** ** ** **

BEFORE: CALDWELL, COMBS, AND KAREM, JUDGES.

KAREM, JUDGE: This appeal is taken from a Jefferson Circuit Court opinion and order denying a motion to compel arbitration. The underlying case, brought by the estate of the late Rockford Smith, alleges negligence and wrongful death against the appellant, Signature HealthCARE at Rockford Rehab and Wellness Center ("Signature"). The circuit court held that no valid and enforceable arbitration agreement existed between Smith and Signature. Upon careful review, we reverse and remand for entry of an order granting Signature's motion to compel arbitration.

On June 6, 2015, Smith appointed his sister, Barbara Leonard-Ray, to be his attorney-in-fact by signing a Durable Power of Attorney ("DPOA"). Smith was admitted to the Signature nursing home facility on several occasions in 2018 and 2019. The two stays at issue occurred from July 18 to September 14, 2018, and March 21 to September 20, 2019. Signature required all incoming residents to sign an arbitration agreement as a condition of admission to the nursing home. On the first occasion, Leonard-Ray signed the arbitration agreement ("First Agreement"). On the second occasion, Signature presented the identical arbitration agreement to Smith ("Second Agreement"), and he placed what appeared to be his initials on the line intended for the resident's signature.

-2-

The Agreements each consist of an identical preprinted form entitled

"**AGREEMENT TO INFORMALLY RESOLVE AND ARBITRATE ALL**

**DISPUTES**."  The form states:

> ***Please know we require all new residents and/or their
> legal representatives to read, agree, and sign this
> Agreement for admission.  Please know you can choose
> care at another facility if you do not wish to sign***.

The form contains a description of the arbitration process and cautions

the resident, facility, and any other person signing the form that:

> **THIS MEANS THAT NO ONE WILL FILE A
> LAWSUIT AGAINST THE OTHER, AND THAT
> EACH PARTY IS GIVING UP, OR WAIVING, THE
> RIGHT TO FILE A LAWSUIT AND HAVE A
> JUDGE OR A JURY DECIDE THE DISPUTE
> AND/OR ANY ISSUES ABOUT THIS
> AGREEMENT**[.]

Of particular significance for this appeal, the form contains a "remain-in-effect"

clause, which provides that the agreement will remain valid if the resident is

discharged and later re-admitted and will apply to all subsequent stays.

After Smith passed away, Leonard-Ray, as the administratrix of his

estate, brought an action for negligence, medical negligence, corporate negligence,

and wrongful death against Signature.  The complaint alleged Rockford received

substandard care at Signature, resulting in falls, pressure ulcers, MRSA,

osteomyelitis, sepsis, malnutrition, respiratory failure, medication errors, and

death.  Signature filed a motion to dismiss and/or to compel arbitration, citing the

First and Second Agreements. Following a hearing, the circuit court denied the motion on the grounds that the Second Agreement rendered the First Agreement void and that the initials on the Second Agreement resident signature line were not a "valid indication of assent" on Smith's part. This appeal by Signature followed. Further facts will be set forth below.

## STANDARD OF REVIEW

"[A]n order denying a motion to compel arbitration is immediately appealable." *New Meadowview Health and Rehabilitation Center, LLC v. Booker*, 550 S.W.3d 56, 58 (Ky. App. 2018) (citing Kentucky Revised Statute ("KRS") 417.220(1) and *Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 340 (Ky. App. 2001)). The Kentucky Uniform Arbitration Act, KRS 417.045 *et seq.*, and the Federal Arbitration Act, 9 United States Code ("U.S.C.") §§ 1 *et seq.* both "evince a legislative policy favoring arbitration agreements, or at least shielding them from disfavor." *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 588 (Ky. 2012). "Arbitration agreements, as with any other valid contract, are generally enforceable. State courts must compel arbitration when there is a valid, written arbitration agreement between the parties." *Jackson v. Legacy Health Services, Inc.*, 640 S.W.3d 728, 732 (Ky. 2022) (citing 9 U.S.C. § 2). Nonetheless, "a party seeking to compel arbitration has the initial burden of establishing the existence of a valid agreement to arbitrate." *Ping*, 376 S.W.3d at 590 (citation omitted).

-4-

"Unless the parties clearly and unmistakably manifest a contrary intent, that initial showing is addressed to the court, not the arbitrator, . . . and the existence of the agreement depends on state law rules of contract formation." *Id.* (citations omitted). "Ordinary contract principles govern the validity of an arbitration agreement." *GGNSC Stanford, LLC v. Rowe*, 388 S.W.3d 117, 121 (Ky. App. 2012) (citations omitted). We review the trial court's application of those state law rules and principles *de novo*, "although the trial court's factual findings, if any, will be disturbed only if clearly erroneous." *Ping*, 376 S.W.3d at 590 (citations omitted).

## ANALYSIS

The trial court agreed with Leonard-Ray that the First Agreement was invalid. Notably, the court did not extensively analyze the enforceability of the original contract. Rather, the court found that there was *either* an abandonment of the First Agreement upon the proposal of the Second Agreement or, in the alternative, a cessation of its enforceability because the stay at the facility had ended; "applying either scenario has the same result: the first agreement is void and unenforceable." However, a deeper analysis of the issue regarding the continued enforceability of the First Agreement is warranted.

Signature argues that the First Agreement, signed by Leonard-Ray, is valid and enforceable because, by its terms, the parties agreed it would remain in

effect for all of Smith's subsequent admissions. The "remain in effect" clause states:

> This agreement will also remain valid, and of full force and effect, even if the Resident is discharged and then later re-admitted to the Facility. It will also apply to all of the Resident's subsequent admissions and stays at any Signature facility.

Neither Leonard-Ray nor Signature challenges the validity of the DPOA, nor do they argue that Leonard-Ray lacked authority under the DPOA to execute the First Agreement. Leonard-Ray argues that the First Agreement is nonetheless unenforceable because (1) she did not complete the section of the Agreement specifying the capacity in which she was acting; (2) a Signature representative did not sign the Agreement; and (3) the First Agreement was superseded by the Second Agreement.

**I. Leonard-Ray's signature was sufficient to create an enforceable arbitration agreement**.

Leonard-Ray signed her name in full on the line designated for "Resident's Authorized Representative/Individual* Signature" on the last page of the First Agreement. The asterisk refers to a footnote immediately below the line which states: "Representative understands and agrees s/he is signing in both representative and individual capacities and that this agreement binds Representative, as well as Resident."

Leonard-Ray did not, however, fill out the section of the Agreement

that is to be completed if the resident is not signing for him or herself. This section

is also located on the last page, immediately above the signature lines. It states:

> If I am not the Resident and am signing on the Resident's behalf, I have shown the Facility evidence of my authority to sign for the Resident, or represented my authority to the Facility with the intention and understanding that the Facility is relying on my representation:
>
> a. I have legal authority to sign this agreement:
>
> (Check all that apply)
>
>  - The Resident, while able, gave me oral authority to make decisions for him/her
>  - I have handled the Resident's legal and business affairs for _____ (years/months)
>  - The Resident signed a written document allowing me to make decisions for him/her (e.g. POA, health care surrogate, living will) COPY PROVIDED
>  - I am recognized as the health care decision maker or surrogate under state law COPY PROVIDED
>  - a court has given me written authority to act and make decisions for the Resident (e.g. conservator or guardian) COPY PROVIDED
>
> b. By allowing the Facility's care and treatment for the Resident, I ratify this agreement, and will not, individually or as a representative of the Resident, contest its validity or enforceability.
>
> c. I understand and agree that the Resident and his/her agents, heirs, beneficiaries, estate, and assigns are the intended beneficiaries of, and will be bound by, this agreement.

Leonard-Ray did not check any of the sections in part (a.). She does not challenge Signature's assertion that she did provide Signature with a copy of the DPOA document. She contends that the Agreement is unenforceable because she signed at most in her individual capacity, not as Smith's attorney-in-fact.

"Kentucky law does not require a party to explicitly state they are acting as an attorney-in-fact[.]" *Cambridge Place Group, LLC v. Mundy*, 617 S.W.3d 838, 841 (Ky. App. 2021). When Thomas Mundy was admitted to a nursing home, his wife Victoria, who held his POA, signed a pre-admission arbitration agreement. "The signature block contained three lines: Thomas was named as the resident on the first line; Victoria signed on the second line, entitled 'Signature of Resident/Legal Representative'; and 'wife' was written on the third line, entitled 'Legal Representative Capacity (i.e. guardian, spouse, child, Attorney-in-Fact, etc.)." *Id*. at 840. The nursing home argued that Victoria's signature was sufficient to create an enforceable arbitration agreement. The *Mundy* Court disagreed, relying on an earlier unpublished opinion, *Kindred Nursing Centers Ltd. Partnership v. Butler*, No. 2013-CA-000880-MR, 2014 WL 3722083 (Ky. App. Jul. 25, 2014). In *Butler*, the resident's son, who held his father's POA, signed a voluntary arbitration agreement on the father's behalf. *Mundy*, 617 S.W.3d at 841 (citing *Butler*, 2014 WL 3722083, at *4-5). In the signature block the son signed his own name and designated his legal

-8-

representative capacity as "son." *Id.* The *Butler* Court held that this signature was not sufficient to create a valid agreement to arbitrate between the resident and the nursing home because the "signature of an individual can signify a vast array of legal relationships[,]" and absent an indication of the capacity under which a signature was executed, the parties were bound by the capacity in which the agreement was signed." *Id.* (citing *Butler*, 2014 WL 3722083, at *5).

Applying this reasoning, the *Mundy* Court agreed with the nursing home "that Kentucky law does not require a party to explicitly state they are acting as an attorney-in-fact," but concluded that "the issue herein is not Victoria's silence but rather her affirmative avowal that she was acting in a separate capacity. In her capacity as wife, Victoria was authorized to make limited decisions on behalf of Thomas; however, the pre-dispute arbitration agreement was outside that scope." *Id.*

By contrast, Leonard-Ray represented herself as Smith's authorized representative and as an individual, according to the signature line. Unlike Victoria, she did not affirmatively state that she was acting in any other capacity. The situation is virtually identical to *BLC Lexington SNF, LLC v. Townsend*, No. CV 5:21-223-KKC, 2022 WL 1721204 (E.D. Ky. May 27, 2022), in which the appellee Townsend, acting within the scope of her capacity as a legal representative for Elam [her sister], signed an arbitration agreement on Elam's

behalf. Townsend signed her name on a line for "Resident/Resident Representative" with no indication of a specific legal capacity. *Id*. at *3. The Court concluded, in reliance on *Mundy*, that the arbitration agreement was valid and enforceable, "whether or not Townsend personally checked the 'POA' box marked elsewhere in the Admission Agreement[,]" because "Kentucky law does not require a party to explicitly state they are acting as an attorney-in-fact." *Id*. at *2-3 (citing *Pannell v. Shannon*, 425 S.W.3d 58, 64 (Ky. 2014)).

Leonard-Ray relies on an unpublished opinion, *Providence Healthcare of Pine Meadows, LLC v. Roark*, No. 2020-CA-0117-MR, 2020 WL 7086083 (Ky. App. Dec. 4, 2020), which predates *Mundy*. Edd Roark was admitted to a nursing home and his son, Keith, who held his POA, signed a voluntary arbitration agreement. The agreement contained a line for him to designate the capacity in which he was acting. He wrote "Keith Roark." He did not indicate on the form that he was signing in his capacity as Edd's attorney-in-fact, although the form asked him to do so. *Id*. at *1. The Court of Appeals held that this was insufficient to create an arbitration agreement between Edd and the nursing home because "the omission of Keith's capacity as POA on the relevant signature lines means that he acted as 'Keith Roark' and not Edd's POA in signing the agreement." *Id*. at *3. Under *Mundy*, the more recent published authority, Leonard-Ray was not required to state expressly that she was acting as Smith's

attorney-in-fact. She did indicate that she was acting as his authorized representative. She did not affirmatively hold herself out as signing in a capacity which would not allow her to enter into an arbitration agreement, such as a spouse (Victoria) or solely in her own capacity (like Keith Roark). Leonard-Ray's signature met the requirements of *Mundy* and did not render the agreement unenforceable.

**II. The absence of a signature from Signature's representative does not mean the First Agreement is unenforceable**.

As to the contention that the First Agreement was unenforceable because it was not signed by a representative of Signature, "it is not always necessary for both parties to sign a contract, particularly where one has signed and both parties thereafter act as if they had a binding contract." *Cowden Mfg. Co., Inc. v. Systems Equipment Lessors, Inc.*, 608 S.W.2d 58, 61 (Ky. App. 1980). "Kentucky courts will also enforce unsigned arbitration agreements where the parties have indicated acceptance of the contract through their actions." *Braxton v. O'Charley's Restaurant Properties, LLC*, 1 F. Supp. 3d 722, 726 (W.D. Ky. 2014) (citations omitted).

Signature was the party that drafted and presented the First Agreement and made signing it a mandatory condition of Smith's admission to the nursing home facility. Signature's assent to the terms of the First Agreement is manifest from these actions.

-11-

**III.  The Second Agreement did not render the First Agreement void and unenforceable**.

The circuit court ruled that the First Agreement was void and unenforceable because once the Second Agreement was presented by Signature, it constituted abandonment of the First Agreement.  It stated:  "While it makes more sense conceptually to say that the [First Agreement] was already null because the stay at the facility was already done, and [Signature's] offering of the [Second Agreement] was tacit acknowledgement of this fact, applying either scenario has the same result:  that the [First Agreement] is void and unenforceable."

There is no support for the assertion that the First Agreement was null because Smith had completed his stay at the facility.  The "remain-in-effect" clause in the First Agreement plainly states that the agreement to arbitrate applies to all subsequent stays.  By its explicit terms, the First Agreement was in effect when Smith was admitted to the Signature facility on March 21, 2019.  The question is whether the presentation of the Second Agreement to Smith indicated that Signature intended to abandon or rescind the First Agreement or that the Second Agreement was so plainly contradictory to the First Agreement that it constituted a novation.

A series of federal court cases applying Kentucky state law have addressed the enforceability of successive arbitration agreements.  They have held that the presentation of a second agreement by a nursing home to an incoming

resident may constitute a novation or abandonment of the first agreement, but only when the arbitration agreement is not a condition of admission and when the resident or the resident's representative has expressly declined the second arbitration agreement. In *GGNSC Louisville St. Matthews LLC v. Badgett*, 728 F. App'x 436, 442 (6th Cir. 2018), Badgett was offered an arbitration agreement as part of an admissions package at a nursing home. He was discharged and later admitted to a second facility owned by the same company. The second admission agreement stated that if the resident had agreed to arbitrate in the past, he must also arbitrate in the future. But he was nonetheless offered the choice of rejecting the current arbitration agreement. He declined the arbitration agreement on his second admission. The Sixth Circuit Court of Appeals found that because the second agreement was inconsistent with the first, the first agreement was extinguished by implied novation. An implied novation occurs "whenever the new contract is manifestly in place of or inconsistent with a former one, or . . . renders a former contract impossible of performance." *Id.* at 441 (citing *Combs v. Morgan*, 307 Ky. 711, 211 S.W.2d 821, 825 (1948)). A "novation relieves parties of the obligations thereunder and results in a new agreement." *Id.* (citing *Wells Fargo Financial Ky., Inc. v. Thomer*, 315 S.W.3d 335, 339 (Ky. App. 2010)).

Because the nursing home offered Badgett a choice to reject the second arbitration agreement, it indicated its intent to extinguish the first

-13-

agreement by substituting a new agreement. *Id*. at 442. "In sum, the second agreement constitutes an implied novation because it is manifestly inconsistent with the first agreement and rendered it impossible of performance." *Id*. at 443.

In *GGNSC Louisville Hillcreek, LLC v. Estate of Bramer by and through Bramer*, 932 F.3d 480, 487 (6th Cir. 2019), successive, identical agreements to arbitrate were presented to Bramer on three occasions he sought admission to a nursing home. The agreements all contained a "remain-in-effect" clause, similar to the one found in the agreements here, but as in *Badgett*, admission to the facility was not conditioned on signing the agreement. The first agreement was signed with an illegible scrawl, the second agreement was signed by Bramer's wife on the wrong line, and Bramer refused to sign the third agreement. The Sixth Circuit Court of Appeals concluded, "If we accept that the parties had already agreed to arbitrate their disputes, the key question is whether re-presenting the identical contract affected the prior Agreements. We can reach no conclusion other than that re-presenting the contract to the Bramers was behavior unmistakably showing that no prior agreement controlled." *Id*. at 486. The Court asked, "If the Agreement is so comprehensive that it binds the parties to arbitration forever, then why did it need to be presented upon each successive visit? This does not bespeak an intent to ratify but **an intent to offer the same choice again to the re-admitted resident**. Otherwise, re-presentment simply

-14-

offers the resident a choice they are not contractually allowed to make, or a choice that is meaningless." *Id*. at 487 (emphasis supplied). On this basis, the *Bramer* Court concluded that the first arbitration agreement had been abandoned.

By contrast, Smith was not offered a choice to refuse the Second Agreement because the agreement to arbitrate was a condition of admission to the facility. Smith continued to be bound by the First Agreement and a refusal to sign the Second Agreement would merely have meant he would not be admitted to the nursing home. The Second Agreement did not, therefore, present a manifest inconsistency as in *Badgett*; it merely repeated the terms of the First Agreement and was, essentially, a reiteration of the parties' intent to arbitrate. This distinction was drawn in *BLC Lexington SNF, LLC v. Oatis*, No. CV 5:19-284-DCR, 2019 WL 6221006 (E.D. Ky. Nov. 20, 2019). When the appellees' mother was first admitted to a nursing home, she signed an admission agreement featuring a "remain-in-effect" clause requiring the mother to arbitrate any claims related to her stays at the facility. Arbitration was a condition of admission to the facility. She was re-admitted to the facility four more times. On the second occasion, she was presented with an identical admission agreement, which her daughter signed as her "resident representative."

The *Oatis* court held that the second agreement to arbitrate did not constitute a novation of the first because "[t]here simply is no indication that the

-15-

parties intended the second arbitration agreement to extinguish and replace the first. Unlike in *Badgett*, the second agreement here was not inconsistent with the first, nor did it render performance of the first agreement impossible." *Id.* at *7 (citations omitted). The court recognized "that it makes little sense for [the nursing home] to re-present a contractual term that the parties have already agreed to and remains in effect. Also, according to the decision in *Bramer*, the facility's doing so is "fundamentally inconsistent with the continued existence of an earlier identical agreement." *Id.* at *8 (citing *Bramer*, 932 F.3d at 487). The court concluded, however, that:

> considering all of the circumstances presented in this case, there is no indication that either party wished to repudiate or rescind the original agreement to arbitrate. After all, arbitration was a condition of admission, which [the mother] did not have the option of rejecting, unlike the parties in *Badgett* and *Bramer*. Further, neither [the mother] nor her daughters took any actions inconsistent with a desire to arbitrate any disputes arising out of [the mother's] stays at the Facility. Put differently, there was no meeting of the minds with respect to rescinding the first agreement or forming a new one which would not require [the mother] to arbitrate her claims against the Facility.

*Id.*

In *Campagna v. GGNSC Louisville Hillcreek, LLC*, No. 3:16-CV-507-DJH-CHL, 2018 WL 3041081 (W.D. Ky. Jun. 19, 2018), the resident signed a new admission agreement on each of his three admissions to a nursing home. Each admission agreement included an arbitration agreement containing a remain-in-

-16-

effect clause. The federal district court held that the most recent admissions agreement was controlling and superseded the two prior contracts, but that all three arbitration agreements were part of the same transaction and that the parties clearly intended to arbitrate their disputes. "In light of *Badgett*, the Court need not determine which arbitration agreement is operative because the Agreements constitute a single 'transaction' that should be interpreted as a whole. When interpreted as a whole, the Agreements clearly indicate the parties' intent to arbitrate their disputes." *Id*. at *4.

In *Golden Gate National Senior Care, LLC v. Rucker*, 588 S.W.3d 868 (Ky. App. 2019), a panel of this Court addressed the enforceability of successive arbitration agreements. A woman was admitted to a nursing home in 2008 and her daughter, as POA, signed an arbitration agreement which stated it "shall remain in effect for all subsequent stays." *Rucker*, 588 S.W.3d at 871. The resident was eventually discharged but then readmitted several years later, in 2014. She was presented with another arbitration agreement. It was not a condition of admission and she declined to sign it. Citing *Badgett*, *Bramer*, and *Campagna*, the *Rucker* Court held that the decision to decline the 2014 agreement superseded the 2008 agreement and constituted a novation. *Id*. While acknowledging the "remain in effect" language in the 2008 agreement, the Court determined that "the number of intervening years and the execution of all new documents on admission in 2014,

-17-

with [the resident] expressly declining the arbitration agreement, essentially nullified the 2008 agreement." *Id.*

By contrast, the length of time between Smith's admissions in this case was relatively short and the presentation of the Second Agreement, while admittedly unnecessary, did not offer Smith the opportunity to act inconsistently with his prior decision to arbitrate. The First Agreement was still in effect on March 21, 2019, and the presentation of the Second Agreement merely confirmed the ongoing intent of the parties to arbitrate.

Because we find, after extensive analysis, that the First Agreement continued to be enforceable, there is no need to address the finding of the trial court regarding the validity of Mr. Smith's signature or his competency at the time the Second Agreement was presented. Therefore, we forgo addressing the issue of the validity of the Second Agreement since our decision regarding the First Agreement renders it moot.

## IV. An argument not presented to the trial court will not be reviewed on appeal.

Lastly, Signature asserts that the signature of Barbara Leonard-Ray binds herself as to wrongful death claims regardless of other issues. In response, Leonard-Ray argues, neither arbitration agreement can be enforced generally as to all the heirs' wrongful death claims. However, neither party raised this argument at the trial court level. "An appellate court 'is without authority to review issues

-18-

not raised in or decided by the trial court.'" *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 734 (Ky. 2009) (citations omitted). Thus, further discussion of this argument is unwarranted and improper.

## CONCLUSION

Because the First Agreement is a valid and enforceable contract to arbitrate that was not rendered void by the Second Agreement, the opinion and order of the Jefferson Circuit Court is reversed, and the case is remanded for entry of an order granting Signature's motion to dismiss the complaint and compel arbitration.

COMBS, JUDGE, CONCURS.

CALDWELL, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

CALDWELL, JUDGE, DISSENTING: Respectfully, I dissent.

Confronted with extensive arguments invoking an array of complex issues, the trial court reasonably and explicitly chose an approach to bypass determination of each and every contested matter. Ultimately, the trial court found Smith had not given his assent to the Second Agreement and the First Agreement had been abandoned. As a result, the trial court did not review the enforceability of the First Agreement.

The majority Opinion of this Court fails to squarely address the trial court's findings regarding the consent of the principal party to formation of the

-19-

Second Agreement. The Court's Opinion begins with analysis of the First Agreement, which the trial court did not analyze. The majority Opinion finds the First Agreement enforceable and any substantive analysis of the trial court's findings regarding the Second Agreement, which the trial court found to lack an indication of Smith's assent, is side-stepped. More concerning, the majority Opinion forecloses on the trial court's ability to review the allegation by the estate of Smith, supported by considerable evidence, that Smith lacked the capacity to contract when Signature presented him with the Second Agreement.

Whether viewed as a finding of forgery or a finding of incapacity, the trial court's finding that Smith did not give his assent to the Second Agreement was supported by clear and convincing evidence. Furthermore, the First Agreement was explicitly abandoned in the larger packet of agreements Signature presented to Smith at the same time as the Second Agreement. I would affirm the trial court as to any claims arising from Smith's 2019 residency.

However, as Smith's estate has also stated claims arising from Smith's 2018 residency, the trial court should have proceeded to a determination of whether the First Agreement is enforceable as to claims arising from the 2018 residency only. Contract interpretation excluded, the trial court is in the best position to evaluate any factual matters regarding enforceability of the First Agreement, and any other evidence not before this Court which might be important

-20-

to determination of enforceability.  I do not believe asserting facts as to the First

Agreement's enforceability is an appropriate determination for this Court.  I would

vacate the trial court's ruling as to those claims only, and remand for further

findings.

I.  THE TRIAL COURT'S CONCLUSION SMITH DID NOT CONSENT TO
THE SECOND AGREEMENT WAS SUPPORTED BY SUBSTANTIAL
EVIDENCE.

When finding abandonment of the First Agreement, the trial court

cited to *GGNSC Louisville Hillcreek, LLC v. Estate of Bramer*, 932 F.3d 480, 486

(6th Cir. 2019).  In *Bramer*, as with the present case, enforceability of successive

arbitration agreements was in dispute:

> The focus of this case is consent.  To evaluate whether
> consent exists, one approach would be to analyze each of
> the three Agreements in the record independently; this
> would include exploring the allegations of forgery as to
> first Agreement (illegible scrawl), and agency as to the
> second Agreement (where Margaret Bramer signed on
> the wrong line as resident).  But there is an easier path –
> the one chosen by the District Court.  Even if the earlier
> Agreements are enforceable, the parties' actions upon the
> third admission carry legal significance.

*Id*. at 487 (citations omitted).

The approach outlined in *Bramer* was dependent upon the final arbitration agreement having been found unenforceable.[1]  In the case before us, the trial court made an explicit finding that the Second Agreement did *not* contain a valid indication of assent.  I would begin review of the trial court's order with examination of its findings of fact and conclusions of law as to the Second Agreement.

Unfortunately, in portions of the order before us, it is difficult to distinguish the trial court's specific findings from its recitation of the parties' arguments.  For example, regarding the initials which appear on the Second Agreement, it was noted:

> Leonard-Ray argued that the second agreement was void because Mr. Smith had not properly signed it, and that he was incompetent to enter into an agreement at the time. In the signature line, there were initials that could be either an "RS" or a "DS" as the writing was someone unclear.

Given what is immediately preceding, the latter sentence could certainly be interpreted as the trial court continuing its description of the argument it has been presented.  However, given the trial court's conclusion, it might reasonably be argued the same sentence is, in fact, a finding which has been adopted by the trial court.

---

[1] It is clear from the onset of the Sixth Circuit's analysis the final arbitration agreement in *Bramer* was unenforceable on its face:  "The parties agree that the [final arbitration agreement] is unsigned." *Id*. at 483.

-22-

Regardless, closing portions of the order contain unmistakable findings made by the trial court. After noting Signature's argument, reiterated by Signature to this Court, that initials, or even a mark, may be found to satisfy the then-current requirements of KRS 355.3-401, the trial court articulated why it was unconvinced, given the facts before it:

> [U]sually an alternative to the signature is specifically asked for in the document, i.e., lines clearly asking for initials, rather than a full signature, are written in the instrument. Here the line clearly asks for a signature, not initials, or even a "mark." The initials offered here do not match what is asked for in the line in which they're placed. The Court judges that this is not a valid indication of assent, since the writing asked for does not match what was allegedly placed by Mr. Smith. Such an approach comports with the requirements of KRS 355.3-401, while also helping to safeguard against competency issues, which would likely require an evidentiary hearing. Accordingly, the Court holds that neither agreement is enforceable.

The parties continue to strongly dispute the source of the initials on the Second Agreement to this Court. Signature maintains the initials indicated Smith's endorsement, while Smith's estate continues to maintain the mark was a forgery, as both did before the trial court.

In support of the forgery allegation, a sworn affidavit of Leonard-Ray was submitted when opposing the motion to compel arbitration. There, she indicated she was "intimately familiar with Rockford Smith's handwriting before and after his stroke" and the initials on the Second Agreement could not have been

-23-

made by either her brother or by herself. Leonard-Ray indicated her brother was on narcotic medication on the date in question and "based on my personal observations the medicine caused him to lose consciousness regularly" and that he was "unable to physically write at the time [the Second Agreement] was purportedly signed." Leonard-Ray further alleged Smith "was unable to understand the nature of his decisions based on [her] personal observations on March 20, 2019[.]"

The affidavit was also cited in support of the estate's argument Smith had lacked the capacity to contract. In further support of this allegation, medical records documenting Smith's condition close in time to his being presented the Second Agreement were tendered. Smith was being treated for sepsis, wound care, osteomyelitis, MRSA, blood loss, anemia, and severe pain on the date he was transferred to Signature. A nursing note from less than 24 hours prior to being presented the Second Agreement assessed Smith's mental status as "confusion/disorientation/sedation." Another record of the transferring hospital indicated Smith was being administered narcotics for pain about six hours before being presented the Second Agreement. Signature's own nursing admission record for Smith, on the same date and just a few hours after being presented the Second Agreement, indicated he was alert and oriented only to person, his mode of expression unclear, and his cognition lethargic. The estate asserted it could

-24-

produce other records demonstrating severely impaired cognitive functioning, should the trial court desire to review.

The trial court's finding that the Second Agreement lacked a valid indication of assent from Smith reads as an indication the trial court found Signature failed to meet its initial burden in establishing a *prima facie* case as to the Second Agreement's enforceability.[2]  Any factual findings the trial court cites in support should be deemed conclusive if supported by substantial evidence. *Green v. Frazier*, 655 S.W.3d 340, 345 (Ky. 2022).

While it is difficult to discern the trial court's factual findings completely, Signature's arguments clearly rest on an assumption the trial court found that the initials were, in fact, made by Smith, in an incomplete or imperfect attempt to indicate his assent to the Second Agreement.  The majority Opinion herein appears to adopt this position from the onset, writing that Smith "placed what appeared to be his initials on the line intended for the resident's signature." This is not consistent with the order appealed.

The opening paragraph of the trial court's order contains the sentence: "During Mr. Smith's admission to the facility, [Signature] had both him and

---

[2] Tasked with deciding a motion to compel arbitration, a trial court's initial determination is whether the "party seeking to compel arbitration has [met] the initial burden of establishing the existence of a valid agreement to arbitrate." *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 590 (Ky. 2012).  To form a valid agreement in Kentucky, "there must be voluntary and complete assent by parties having the capacity to contract." *Cambridge Place Group, LLC v. Mundy*, 617 S.W.3d 838, 840 (Ky. App. 2021).

-25-

Leonard-Ray sign multiple agreements, including an arbitration agreement." The trial court used the singular when referring to an arbitration agreement being signed among multiple agreements between Smith and Leonard-Ray. Also in the trial court's findings, it is noted the initials were "*allegedly* placed by Mr. Smith." (Emphasis added.) Earlier in the order, in the more ambiguous portion, a description of the initials indicated "the writing was *someone* unclear." (Emphasis added.) Outside of clear descriptions of the arguments of Signature, I locate no mention of Smith having made the marks on the Second Agreement himself, and certainly no unambiguous finding by the trial court that he did so.

The estate for Smith argues the only sworn evidence that was before the trial court, the affidavit, indicates the initials are a forgery. However, even if the trial court's findings are interpreted to indicate Smith *did* sign the Second Agreement, the estate argues, the order should still be affirmed, citing an unpublished case in support.

In *Kindred Healthcare, Inc. v. Fields*, we examined an 'X' mark on an arbitration agreement, which the trial court had determined did not indicate assent. No. 2013-CA-001901-MR, 2015 WL 4153629, at *1 (Ky. App. Jul. 10, 2015). As with this case, it was strongly disputed whether the mark in question had been made by the decedent. *Id*. at *2. Ultimately, we affirmed the trial court's finding that even if the 'X' mark were made by the resident, it was insufficient to qualify

as a signature proving the "present intention to authenticate the agreement[,]" given the circumstances of the case. *Id*. at *1, 3. The facility had therefore failed to meet its burden of establishing *prima facie* evidence of an agreement. *Id.* at *3.

While I agree the general approach in *Fields* is applicable to this matter and supports affirmation of the trial court's findings, there is a distinction to be made. The trial court in *Fields* found that, even had the disputed mark been made by the resident, it was insufficient to establish his consent. *Id*. at *2. The resident's ability to write his name was consistent with a conscious choice not to do so, along with medical records indicated he cooperated with facility personnel only under protest, were substantial evidence supporting the conclusion the 'X' indicated a conscious decision *not* to indicate his assent. *Id*. at *2.

In other words, the trial court order indicated: either the disputed mark was a forgery, or it was confirmation of his refusal to assent, when considered with the near contemporaneous medical evidence of his condition and demeanor.

In the case before us, the trial court order indicated: either the disputed mark was a forgery, or it was confirmation that Smith lacked the capacity to contract, when considered with the near contemporaneous medical evidence of his condition and demeanor. The trial court's findings here indicate that, even if the disputed initials *were* made by Smith, his marking only his initials when his

-27-

full signature was requested, along with the medical evidence concerning severe cognitive issues at the time the Second Agreement was signed, supports a finding he lacked capacity to contract.

The trial court's findings do *not* exclude the possibility the initials on the Second Agreement were a forgery. Nor do the findings exclude the possibility Smith lacked the capacity to contract, even if the initials *were* made by him. Either scenario would render the Second Agreement unenforceable. Neither finding would be clearly erroneous, based upon the evidence before the trial court.

## II. THE TRIAL COURT'S FINDING AS TO ABANDONMENT SHOULD BE AFFIRMED AS TO CLAIMS ARISING FROM THE 2019 RESIDENCY.

A. The Admission Agreement presented to Smith contemporaneously with the Second Agreement should be considered in any *de novo* review on the question of formation.

The Second Agreement was presented to Smith as part of a larger admissions packet. This included a document titled "Admission and Financial Agreement" which, from its appearance, was the general admission agreement ("Admission Agreement"). Along with the rest of the admissions packet, the Admission Agreement was submitted to the trial court by the estate for Smith during the briefing for the motion to compel arbitration. Puzzlingly, the terms of the Admission Agreement are not discussed by the parties in their briefs. Nevertheless, consideration of the Admission Agreement is essential to proper

-28-

analysis of the issue of successive arbitration agreements, as examination of the case law cited by the majority confirms.

The Admission Agreement demonstrates the matter of abandonment of the First Agreement occurred quite explicitly. Any and all prior agreements between Smith and Signature, with no exception for arbitration agreements, are expressly superseded by the Admission Agreement. A section titled "Additional Documents" indicates:

> This Agreement, together with the information and documents in the Resident Handbook & Admission Information, executed by both parties, represents the entire understanding between the parties, *and supersedes all previous representations, understandings, or agreements, oral or written, between the parties*.

(Emphasis added.)

This paragraph distinguishes the matter here from the case law cited by the majority. For example, the admissions agreement in *Campagna v. GGNSC Louisville Hillcreek, LLC*, read:

> This [Admissions] Agreement supersedes any prior admission contracts regarding your admission to our LivingCenter. *However, if you execute, or have executed, an Alternative Dispute Resolution Agreement with us in connection with any admission to our LivingCenters, then that Agreement shall be, and remain, binding upon you, and upon us, in accordance with the terms that are set forth in that Agreement.*

No. 3:16-CV-507-DJH-CHL, 2018 WL 3041081, at *1 (W.D. Ky. Jun. 19, 2018); (emphasis added).

Similarly, in *GGNSC Louisville St. Matthews LLC v. Badgett*, the final admissions agreement indicated all prior agreements between the parties were superseded *with the explicit exception of arbitration agreements*. 728 F. App'x 436, 440-41 (6th Cir. 2018). Incorporation of the prior arbitration agreement in the latter admission agreement was the court's reasoning for considering the prior arbitration agreement at all, with regards to latter disputed admission. *Id*. at 441. Likewise, in *Bramer*, the arbitration agreements were each presented as part of an admissions packet which included an admission agreement. 932 F.3d at 484. There as well, the final admission agreement *incorporated prior arbitration agreements by explicit reference, and asserted any previous agreements would remain binding*. *Id*.

Here, the First Agreement's enforceability as to Smith's 2019 residency, despite it having a "remain-in-effect" clause, is a more straightforward matter. I locate no express reference to, exception for, or incorporation of *any* arbitration agreements in the Admission Agreement, including the Second Agreement. This includes an absence of any indication signing an arbitration agreement was a requirement for admission. In fact, significant portions of the Admission Agreement are in direct conflict with the Second Agreement itself, in

-30-

the resident's responsibilities, should Smith fail to timely pay a bill presented by Signature, he is advised, "*we may request a court to order such payment* or take other legally appropriate measures." (Emphasis added.)[3]

B. Even without considering the Admission Agreement, the majority's analysis is mistaken.

A number of distinctions should be made between the underlying facts of this case and those in *BLC Lexington SNF, LLC v. Oatis* which demonstrate why the majority Opinion's reliance on the analysis in *Oatis* is misguided. No. CV 5:19-284-DCR, 2019 WL 6221006 (E.D. Ky. Nov. 20, 2019). The presence of the Admission Agreement here, presented alongside the Second Agreement, is certainly one. In *Oatis*, there was re-presentation of two identical *admission* agreements, each of which contained the same *arbitration* clause. No other documents appear to have been at issue. 2019 WL 6221006, at *1-2.

However, even if this issue were hypothetically put aside, in an attempt to salvage an approach from *Oatis*, other factual distinctions reveal a poor fit for the underlying matter. One is that the Second Agreement form presented to Smith is *not* identical to the First Agreement form, unlike the identical admission agreements in *Oatis*. *Id*. at *2. The underlying arbitration agreements are similar,

---

[3] Numerous other provisions appear inconsistent with Signature having actually agreed to relinquish any of its own rights to pursue litigation in court against Smith, indicating legitimate questions as to enforceability for reasons of illusory promise or mutuality of obligation, might have been examined by the trial court, had it found Smith's assent.

but a number of revisions can be located, including language in the Second Agreement ostensibly broadening the scope of what might be considered "disputes" to be arbitrated. It may *not* be said there is no identifiable indication of any intent to change the terms of the First Agreement, unlike *Oatis*.

Further, the sequence of when the disputed agreements were presented to the principal and when they were presented to a third-party are reversed in the underlying matter as compared to *Oatis*. This carries a number of implications. The *Oatis* court found the re-presentation of an identical admission agreement, to a third-party who lacked authority but nonetheless assented, could not be considered an implicit abandonment or novation *which could be demonstrated by the principal. See id.* at *7. "Instead, [the unauthorized third-party's] agreement to arbitrate has no impact on [the principal's prior] valid agreement to arbitrate claims related to 'any of [her] stays' at the facility." *Id.* at *7.

This is entirely unlike the matter at hand. Here, the *First* Agreement was presented to a third-party, but the Second Agreement was presented to the principal, *whom the trial court found did not give his assent*. A principal who has withheld consent and a third-party who indicated assent but lacked appropriate agency powers are distinct positions under Kentucky contract law. This alone renders the majority's reliance on *Oatis* mistaken. However, looking further, a compounded error results.

It is noteworthy that the *Oatis* opinion is one of a trial court when identifying perhaps the most critical distinction to be made from the present matter. The *Oatis* court specifically found that the decedent *did* have capacity to contract, at the time she signed the first arbitration agreement, and had assented to its formation. *Id*. at *6. Evidence submitted on the issue was considered in a lengthy discussion before the trial court's finding. *Id*. at *4-6. *Only then* did the district court proceed to its analysis of the second agreement, upon which the Court here relies. *Id*. at *6-9. The *Oatis* court was clear that "there can be no agreement to arbitrate without the parties' mutual consent." *Id*. at *6 (citations omitted). Again, the trial court here has found that the principal *did not consent* to the Second Agreement he was presented.

The majority Opinion's statements, concerning arbitration as a requirement for admission and indications a principal has expressly declined an agreement, are far too broad for consistency with the cases cited. The proper approach to resolving a question as to formation is by application of Kentucky contract law principles. No blanket statement rule regarding these factors, and when they might foreclose on a finding of abandonment or novation, may be properly extrapolated from the case law cited by the majority.

Kentucky courts have determined an arbitration agreement's indication that it is a requirement for admission *is* relevant to questions regarding

the agency powers on the part of a power of attorney. *LP Louisville East LLC v. Patton*, 651 S.W.3d 759, 764 (Ky. 2020) (citing *Ping*, 376 S.W.3d at 590). Elsewhere, Kentucky courts treat such a requirement for admission as having some relevance to evaluation of a facility's claims of estoppel. *Wiley v. Masonic Homes of Kentucky, Inc.*, 694 S.W.3d 322, 330 (Ky. 2024) (citing *Ping*, 376 S.W.3d at 595). However, I locate no Kentucky case holding a requirement-for-admission clause forecloses the possibility of abandonment of a contract by the parties' implied agreement.

Further, under the facts at hand, I am skeptical the undisputed evidence here unambiguously indicates Signature required all residents to sign an arbitration agreement. Scrutinizing the Admission Agreement, standing alone, mutual abandonment of prior agreements might be said to be a requirement for admission. In the Admission Agreement, there is a clause indicating that all prior agreements are superseded, with no contemporaneous document indicating otherwise. Moreover, as mentioned above, the Admission Agreement contains language ostensibly contradictory to *any* agreement to arbitrate being in effect between the parties.

Viewing the Admission Agreement alongside the Second Agreement, when considering the trial court's findings, does not change this. The third line of the Second Agreement begins "Thank you for *considering* our Facility!"

-34-

(Emphasis added.)  The plain language, thanking a potential resident for considering admission to the facility, is consistent with the Second Agreement being presented while the parties were still in the negotiation stage of determining whether Smith would be admitted.

Only when standing alone, and putting aside the matter of his consent, do the terms of the Second Agreement appear to indicate Smith having the choice only to agree or be refused admission.  When viewed alongside the Admission Agreement, through the lens of ordinary contract law, and given the trial court's finding Smith did not assent to the Second Agreement, one might view the parties as proceeding to a final agreement – Smith's admission to Signature – despite abandonment of both the First Agreement and Second Agreement along the way.  Nothing would be unusual about parties failing to secure to come to an agreement as to one term, even one initially proposed as mandatory by one party, and still reaching a larger agreement, in ordinary negotiation toward formation of a contract.

I would affirm the trial court's finding of the parties' abandonment of the First Agreement, as to Smith's residency in 2019.  However, unlike *Bramer*, the estate for Smith has stated claims arising from 2018 residency as well.  For that reason, I would remand the trial court's order for additional findings and a determination of the enforceability of the First Agreement *only as to the claims*

*arising from the residency prior to 2019.* This determination involves evaluation of factual evidence the trial court is better positioned to examine than this Court. *See Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). Furthermore, consideration of other agreements presented contemporaneously to Leonard-Ray along with the First Agreement are relevant to the determination and the trial court is, again, best positioned to inquire as to these.

III. THE MAJORITY OPINION LEAVES THE QUESTION OF INCAPACITY UNADDRESSED.

Even if the above were inapplicable, there would remain a disputed issue of fact regarding Smith's capacity to contract. Examination of the trial court's order, alongside the briefs alone, demonstrates Smith's capacity to contract was in dispute. The record demonstrates Smith's estate requesting, in the event the trial court might be inclined to find Signature's *prima facie* burden had been met, a period of limited discovery on the issue of capacity. No reasonable interpretation of the trial court's order could conclude an affirmative finding of Smith's capacity to contract was made. The majority Opinion fails completely to address this.

Capacity, both legal and mental, is a necessary and constituent element of a simple contract. *See Stege v. Stege's Trustee*, 237 Ky. 197, 35 S.W.2d 324 (1930). The trial court's order should, at most, be vacated and remanded for a determination of Smith's capacity to contract when he, as principal, was presented the Second Agreement, which was not identical to the First

-36-

Agreement. The Sixth Circuit, in *Bramer*, declined to "dismiss the nursing home's re-presentation as mere bureaucratic enthusiasm." 932 F.3d at 488 n.5. I fear the majority Opinion treats re-presentation of successive agreements to persons potentially lacking even the capacity to contract as the "mere bureaucratic enthusiasm" of which *Bramer* warned. Therefore, I must dissent.

BRIEFS FOR APPELLANTS:

A. Pete Pullen
Shem D. Beard
Louisville, Kentucky

BRIEF FOR APPELLEE:

Richard E. Circeo
Lisa E. Circeo
Lexington, Kentucky